# GAMBLE-ROBINSON COMPANY v. MASSACHUSETTS BONDING & INSURANCE COMPANY.[1]

December 16, 1910.

Nos. 16,861—(111).

**Fidelity insurance — unreasonable delay in giving notice of dishonesty.**
Appellant was informed by the written cash reports of its employee, a traveling salesman, that he was indebted to the company in the sum of $553.21, and received from him $25 on account, with the statement that there were credits and discounts due him sufficient to balance the account. During the succeeding three weeks appellant caused the books to be checked up and the accounts of the customers to be examined, to determine the correctness of his report and the existence of the discounts and credits claimed; but for the period of four weeks thereafter nothing special was done in that direction. The employee continued in appellant's employment in another locality, and made three payments of $25 each out of his own salary to apply on his account. It was then discovered that he had collected an account which had never been reported, and he was discharged, and the bonding company notified of the shortage.

In an action against the respondent bonding company to recover the

[1]Reported in 129 N. W. 131.

amount of the shortage, *held*, that the delay to notify respondent of the facts was unreasonable, and not in accordance with the provisions of the bond, which provided that the insurer should indemnify the employer for pecuniary loss sustained by reason of the fraud or dishonesty of the employee, and required that upon discovery of any act of fraud or dishonesty the employer should immediately give notice thereof to the bonding company.

Action in the municipal court of Minneapolis to recover upon defendant's indemnity bond the sum of $499, alleged to have been embezzled by plaintiff's traveling salesman. The complaint alleged that plaintiff had performed all the conditions of the bond on its part, and attached a copy of the bond to its complaint.

The answer alleged that if any loss were sustained by plaintiff by reason of the dishonesty or fraud of Frisbee which amounted to either embezzlement or larceny, it occurred prior to August 3, 1908, of which plaintiff had knowledge on or about that day, and that plaintiff knew of said acts of dishonesty on September 7, 10, 27, and at all times between August 3 and September 27; and that on September 7 plaintiff made a settlement with Frisbee for any loss covered by the bond, without defendant's consent, and that at that time plaintiff condoned an act for which defendant might have been liable; that this was also done on September 17 and 27; that plaintiff did not, upon discovery of the fraud, immediately give defendant notice thereof; that plaintiff did not give in writing to defendant full particulars of any claim made under the bond within sixty days after discovery of the fraud.

The case was tried before Waite, J., who directed a verdict in favor of defendant. From the judgment entered pursuant to the verdict, plaintiff appealed. Affirmed.

*Walter Holsinger,* for appellant.

*Brown, Albert & Guesmer,* for respondent.

Lewis, J.

The Gamble-Robinson Company was a corporation engaged in the fruit commission business at Minneapolis. Appellant, Gamble-Robinson Company, was an associate corporation engaged in the same business at Rochester, Minnesota; the officers of both corporations

being identical, all residing at Minneapolis.    This action was brought to recover $499 from the respondent, claimed to be the amount of shortage in an account of an employee, W. J. Frisbee.    The surety bond provided as follows:

"At the expiration of three months next after proof satisfactory to the company, as hereinafter mentioned, make good and reimburse to the said employer such pecuniary loss as may be sustained by the employer by reason of the fraud or dishonesty of any or either of the employees named upon said schedule, or added thereto as hereinafter provided in connection with his duties as specified on said schedule, amounting to embezzlement or larceny:    *    *    *

"Provided, that on the discovery of any such fraud or dishonesty as aforesaid on the part of any employee, the employer shall immediately give notice thereof to the company, and that full particulars of any claim made under this bond shall be given in writing addressed to the company, at its office in the city of Boston, Mass., within sixty days after such discovery as aforesaid    *    *    *

"If the employer shall fail to notify the company of the occurrence of any act of dishonesty on the part of any of the employees as soon as it shall have come to the knowledge of the employer, or shall continue to intrust the employee with money or valuable property after such discovery, or makes any settlement with the employee for any loss hereunder without the consent of the company, or condones any act for which the company may be liable, then the company shall be discharged from any and all liability under this bond as to such employees."

At the close of the trial the court directed a verdict for respondent, upon the ground that appellant had failed to notify respondent, within a reasonable time after its knowledge, of the acts of dishonesty which Frisbee had been guilty of.

The rules of law governing such cases have been stated as follows: "The general rule is that the question of reasonable time is one of fact, and must be submitted to the jury with proper instructions; but when the facts are undisputed, and only one reasonable conclusion can be drawn therefrom, it is the duty of the trial judge to instruct the jury accordingly."    George A. Hormel & Co. v. American

Bonding Co., 112 Minn. 288, 128 N. W. 12.   If a bond is fairly and reasonably susceptible of two constructions, one favorable to the insured and the other to the insurer, if consistent with the objects for which the bond was given, that construction favorable to the insured must be adopted.   Though the insured may have had suspicions of irregularities, or fraud, he is not bound to assume that an employee is guilty of acts of dishonesty until he has acquired the knowledge of such specific fraudulent or dishonest acts as might involve the insurer in liability for misconduct.   American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. ed. 977.   The object of giving such a notice is to enable the insurer to take steps for its protection, and what is a reasonable time and what constitutes knowledge depends, of course, entirely upon the circumstances of each particular case.   The object of such a bond is to indemnify the insured against loss arising from any act of fraud or dishonesty on the part of employees, and such object should not be defeated by any narrow interpretation of its provisions.   But this rule should not be availed of to refine away the terms of the contract expressed with sufficient clearness to convey the plain meaning of the parties.   Guarantee Co. v. Mechanics' Savings Bank & Trust Co., 183 U. S. 402, 22 Sup. Ct. 124, 46 L. ed. 253.

Mr. Frisbee had been employed by the Rochester Company for about a year prior to August 3, 1909, as a traveling salesman and collector at a salary of $90 per month, and his territory was in northern Iowa and southern Minnesota.   On the third of August his territory was changed to Minneapolis, and he came directly under the supervision of the Minneapolis house.   It had been Mr. Frisbee's custom to collect accounts and to make daily reports to the Rochester house of the amount of his collections and credits.   When called to Minneapolis on August 3, he presented a cash report to the president, which showed upon its face a cash balance of $553.21; but he turned over only $25 in cash.

Mr. Robinson, the secretary and treasurer, testified as follows as to what took place: "Monday morning, I should say about 9 o'clock, August 3d, I met Mr. Frisbee in a small private office of Mr. Gamble's.   *   *   *   I was going by that office on the stairway, and I saw

Mr. D. F. Gamble and Mr. Frisbee standing there talking, and I stepped in. Mr. Gamble handed me a cash report signed by Mr. Frisbee, and called my attention to it, and said, 'What do you think of this?' or words something like that, and I picked it up and looked at it, and I saw that it was a cash report signed by Mr. Frisbee, covering the collections at Rochester, and there was a balance of five hundred and fifty some dollars, and that there was no money with the report to offset that balance. I made some exclamation of surprise. I don't remember now just what I said—somewhat surprised—and Mr. Frisbee spoke up and says, 'That looks bad.' But he says, 'That is not the way it looks.' He says, 'I don't owe the house that amount.' He says, 'There are credits for discounts allowed and allowances made customers and merchandise that should be credited that I have reported that the house has not credited to these customers, which will probably offset that.' Q. Yes, sir; and what did you say? A. I didn't say very much. I don't know as I said anything at that time, except that I made some mention that we would have it checked up and see whether it was right or not."

Mr. Robinson further testified that Mr. Frisbee had been distributing cars of goods through the spring and summer and might have been inaccurate in the report he made to the house, which, of course, would have affected his balance. Mr. D. F. Gamble, the treasurer, testified as follows: "A. Mr. Frisbee came in in a hurry and puffing, and said he had only a few minutes to make a train, and handed in a statement covering his reports at Rochester, and I talked with him perhaps a couple of minutes before Mr. Robinson came down. Q. What did he say to you? A. His first statement to me was, 'Here is a statement showing my balance due Rochester,' and I looked at it half a minute, and I was surprised to see a statement of that kind, and said so to him. He says, 'Mr. Gamble, those figures show there is that much due Rochester, but in reality is not true, because there are a good many credits for allowances, discounts, and shortages which my customers haven't had credit for,' and he says, 'I doubt if I owe the house in Rochester anything after everything is checked up.' "

Mr. Robinson immediately telephoned to the Rochester house to

check up Frisbee's account, which was done by the bookkeeper in charge, and a man was then sent out over Mr. Frisbee's territory to check up his accounts with the customers. This man covered only part of the territory, and came back within a week, and reported Frisbee's acts confused, but that no amount was found collected which had not been reported. A second man was sent out, who covered a part of the territory, and he came back with a similar report. No other special party was sent out, but a salesman and collector was kept in the regular business, and nothing further was done to investigate Frisbee's accounts until September 28 following, when it was found out that an account not mentioned in any of his cash reports had been collected by Frisbee. This fact was communicated to the Minneapolis house, and Frisbee was at once discharged, and the bonding company notified of the shortage. During all this time Frisbee continued in the employ of the Minneapolis house. It appears, however, that during that time he paid out of his salary to the house the sum of $75, as follows: September 7, $25; September 10, $25; and September 27, $25. The first cash report in evidence, that of July 11, showed a cash balance on hand at the time of his previous report of $51.77, and a total amount due of $80.30. The July 17 report showed this amount, $80.30, due at the date of the last report, and a total of $79.34 due July 17. The July twenty-third report showed a total amount due of $89.45, and the July twenty-fifth report stated that the cash on hand July 23 was $89.45, and showed a balance due July 25 of $74.79. An examination of the cash report dated August 3 discloses that the total amount of money received by Frisbee during the time covered by it was $862.-28, and the total amount of the credits was $309.07, leaving a balance due the house of $553.21. This report covered five days, from July 25 to August 1, and showed that the amounts had been collected from sixteen customers in northern Iowa and southern Minnesota.

The trial court made a critical analysis of this report, and attached great importance to the evidence appearing on its face. Evidently Messrs. Gamble and Robinson had no reason to believe that the credits claimed by Frisbee grew out of the transactions in connection with the sixteen customers referred to in his last report,

and if they believed his statement that there were such credits they must have known that they grew out of prior transactions which had not been reported, and that his previous reports had been incorrect and misleading, if not untrue. It may be assumed that their conduct immediately succeeding the third of August was consistent with a belief that the shortage grew out of some excusable mistakes, and that they were justified in taking steps to have the books checked up and Frisbee's accounts examined for the purpose of adjusting the discrepancy.

But it is impossible to reconcile their conduct subsequent to the month of August with a sincere belief in Frisbee's innocence. The books had been checked up and no mistakes discovered. Two men had been sent out for the purpose of making examination of the accounts with Frisbee's customers, and nothing definite had been ascertained. Then the matter was dropped, without any further effort to discover whether Frisbee was telling the truth or not. Frisbee himself recognized the shortage by making payment of $25 on September 7 and two such payments subsequently. The money was accepted, sent on to Rochester to be credited to his account, and yet the company took no further active steps to determine the true state of his affairs.

The bond under consideration in the Hormel case differed somewhat, and there was no question as to the time when the owner obtained knowledge of the facts he was required to report to the surety. In the present case the insured was required to report acts of dishonesty; that is, acts which should have satisfied the officers as reasonable men that Frisbee had been guilty of dishonesty. The object of requiring the notice was to enable the insurer to make investigations and to take the necessary steps to indemnify itself. After ascertaining the facts and being informed that there was a probable shortage, the plaintiff was required to give the notice within a reasonable time. The officers were bound to comply with the terms of the bond, and the delay until September 28 was inexplicable on any reasonable theory. The question of shortage had passed beyond mere suspicion. It was standing out as a probable fact, and there was no further ground for hesitancy. It was not necessary

to brand Frisbee as a thief. All that plaintiff was required to do was to lay the facts before the insurer.

We are satisfied the delay was unreasonable, and that the trial court was correct in directing a verdict in favor of respondent.

Affirmed.