## BERKSHIRE LAND CO. *v.* MORAN.

1. PRINCIPAL AND SURETY—SURETY FOR HIRE—SURETY RELEASED BY SUBSTANTIAL BREACH—STRICTISSIMI JURIS.

A surety who is prejudiced or suffers loss by reason of a substantial breach of the contract on the part of the assured is relieved of liability, although paid for the undertaking, and said holding is not in conflict with the former holdings of this court in applying the rule of *strictissimi juris*.

2. SAME—PROMPT NOTICE OF BREACH—REASONABLE REQUIREMENT.
Under conditions as they existed in 1916, during the world war, when, according to testimony, the cost of excavation

On the question of discharge of surety on fidelity obligation by failure of employer to discover delinquency or to notify surety thereof within the time specified in the obligation, see note in L. R. A. 1916F, 715.

and similar work would jump up 10 or 15 per cent. every three or four months, it was not an unnatural or super-technical precaution to provide, in an indemnity bond for the faithful performance of a paving contract, that the surety should be promptly notified of any breach of the contract or any other act or omission on the part of the principal which might involve or cause a loss for which the surety might be answerable.

3. SAME—"IMMEDIATELY"—DEFINITION.

The requirement in the bond that notice of default be given "immediately" does not mean "without any time intervening," or "instantly," but means that the notice should be timely or promptly given, without unnecessary delay, and with reasonable diligence, that the surety might take all available steps for its protection.

4. SAME—BREACH OF CONDITION—DELAY OF 30 DAYS—RELEASE OF SURETY.

A delay of about 30 days after the time fixed for the completion of the paving contract, in notifying the surety of the breach, *held*, sufficient to discharge the surety, under the conditions shown by the record.

Error to Wayne; Mandell (Henry A.), J. Submitted January 15, 1920. (Docket No. 8.) Decided April 10, 1920.

Assumpsit by the Berkshire Land Company against William E. Moran, principal, and the Fidelity & Deposit Company of Maryland, surety, on a bond. Judgment for plaintiff against the principal only. Plaintiff brings error. Affirmed.

*Goodenough, Voorhies & Long,* for appellant.

*Keena, Lightner, Oxtoby & Hanley,* for appellee surety.

STEERE, J. Plaintiff is an incorporated land company owning a subdivision in Grosse Pointe Park village traversed by a dedicated thoroughfare known as the Yorkshire highway. On March 25, 1916, it en-

tered into a written contract with defendant Moran to pave said Yorkshire highway according to plans and specifications attached to and made a part of said contract. By the terms of this contract Moran was required to furnish a bond for its faithful performance and such bond of even date therewith was attached to the contract, defendant Fidelity & Deposit Company being surety thereon.

The specifications made a part of this contract required the work to be commenced on or before April 1, 1916, and completed within 120 days, or by August 1, 1916. Moran commenced preparation for the work early in April, that first required being certain rough grading, for which a steam shovel was obtained after some delay and put upon the job. Its work was finished in two or three weeks. Following this the work lagged and it is claimed comparatively little more was accomplished. In August, 1916, Moran threw up the contract and ceased all efforts, owing, as he testified, to his resources being exhausted. The first notice to the insurance company that he had failed in performance and was in default is dated August 30, 1916, to which no immediate reply was made. A second letter, dated September 9th, was sent the surety company referring to the first and saying in part:

"If it becomes necessary to relet the work, this action ought to be taken in the near future in order to prevent our client being put to the loss of having the property unimproved during the winter."

Under date of September 11th the surety company acknowledged the receipt of these letters, stating the matter had been referred to its Detroit agent; and on October 7, 1916, its special agent wrote plaintiff that it would not exercise any right which it might have to complete the contract. On receipt of such notice plaintiff sought to obtain bids for its completion from

all available contractors, many of whom were unwilling to bid under the then uncertain conditions as to cost of labor and material, but on October 26, 1916, a bid was received from a responsible contractor named Cook followed by a contract with him to complete the contract according to the original plans and specifications at an increased cost, as plaintiff claimed, of over $9,000 more than Moran's contract price. Cook eventually completed the work according to agreement and was paid in full by plaintiff.

This action was brought in the circuit court of Wayne county against Moran and his surety to recover damages resulting from delay and additional cost of completing the contract as to which he defaulted. Upon the trial a verdict was directed by the court in favor of the defendant surety company on the ground that plaintiff had failed to comply with the conditions of Moran's bond requiring prompt notice to the surety of his failure to complete his contract, and the jury was instructed as to Moran's liability that plaintiff was entitled to a verdict in an amount somewhere between a minimum of $5,000 and a maximum of $9,455.48, which was submitted for the determination of the jury within those limits and a verdict was rendered against Moran for $6,080.48, and judgment entered accordingly.

Plaintiff thereafter removed the case to this court for review on numerous assignments of error which, as stated in its counsel's brief, involve for consideration the two questions:

"1. Whether the fact that plaintiff did not notify the surety company immediately after August 1st that Moran had not completed the contract discharged the surety. * * *

"2. Whether the verdict against Moran could under the testimony have been for any sum less than $9,494.48, the amount paid by plaintiff in excess of what it would have been obliged to pay Moran."

The main contention is over the first question, to which the briefs of counsel are largely devoted. The trial court directed a verdict for the Fidelity & Deposit Company on the ground that it appeared by the undisputed testimony that plaintiff first breached the bonding contract by neglecting to seasonably notify the surety of Moran's default, which was a condition precedent to its recovery.

The bond is in the sum of $25,000, runs to the Berkshire Land Company, called the "owner," recites in the instrument that it is given by Moran as "principal" and the Fidelity & Deposit Company called the "surety." It is conditioned in customary phraseology on the principal faithfully performing the described paving contract according to its terms, and is expressly made subject to certain stated conditions precedent and provisions, the material portions of which are as follows:

"1. The owner, as a condition precedent to any recovery hereunder, shall faithfully perform all the terms, covenants and conditions set forth in said contract and in this bond, or in either of them, to be performed by the owner at the time and in the manner specified.

"2. The owner shall notify the surety by registered letter, addressed and mailed to the surety at its home office in Baltimore, Maryland, of any breach of said contract by the principal, or any act or omission of the principal, or of any agent or employee of the principal which may involve or cause a loss for which the surety may be liable, immediately after which breach or act or omission shall have come to the knowledge of the owner or any representative of the owner authorized to supervise the performance of said contract and if the principal abandons said contract or is lawfully compelled by reason of a default to cease operations thereunder the surety shall have the right at its option to assume the contract and to sublet or complete the same."

210—Mich.—6.

The agreed date for completion of this contract was 120 days after April 1st which, accepting plaintiff's computation, was August 1, 1916. The undisputed evidence is that the contractor not only failed to complete the work within the contract time, but totally failed to subsequently perform his agreement at a later time, as urged to do by plaintiff's agent without the surety's knowledge, or consent to an extension of time. Plaintiff had covenanted with the surety that in the event of the contractor's breach of his contract, or if he was guilty of any act or omission "which may involve or cause a loss for which the surety may be liable," it would immediately after such "breach, act or omission came to its knowledge or that of any representative," notify the surety by registered mail. That this was not done within the plain meaning and intent of the condition precedent so requiring, is conclusively shown by plaintiff's own testimony. In a case closely analogous, which was referred to by the trial court in directing a verdict for the surety, it is said:

"The plaintiff failed to keep his covenant before the surety company had in any way failed to comply with those which it had made. On this account, he cannot enforce the fulfillment of the covenant of the defendant. He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for a subsequent failure on his part to perform." (Citing many cases.) *National Surety Co.* v. *Long*, 60 C. C. A. 623, 125 Fed. 887.

Of this decision plaintiff's counsel urge that it followed the rule of *strictissimi juris* and is "out of line with later decisions," citing and discussing many cases in support of their contention that the trend of modern authority departs from the strict rules of forfeiture laid down in the *Long Case*. We do not understand that those authorities depart from or modify

the general rule relating to contracts stated in the *Long Case,* but do hold in construing various indemnity bonds given by paid securities that under the facts involved in the respective cases failure or delay in giving notice or some other deviation from strict compliance was not, or may not have been where facts are at issue, a material variance, or "substantial breach," of the contract unless it appear that the paid surety was in some manner prejudiced or suffered loss by reason of the same. As the decisions of this court tend to that rule of construction it is unnecessary to discuss the many cases cited from other jurisdictions. *People* v. *Bowen,* 187 Mich. 257; *People* v. *Traves,* 188 Mich. 345; *Ladies of the Modern Maccabees* v. *Surety Co.,* 196 Mich. 27.

Plaintiff's secretary, and first witness, B. C. Spitzley, testified that he was the one immediately concerned with the details of the work as it was going on from day to day and reported it to the directors; that shortly after the paving contract was let to Moran some preliminary work was done while he was waiting for the steam shovel, over which there was delay. Of this he said:

"I think it was around the first of June the steam shovel arrived. That is the time the excavating commenced. After the steam shovel was on the ground, the work progressed very satisfactorily for a period of time—I should say for two or three weeks until the rough excavating was completed and then the work stopped entirely. I made numerous attempts to get in touch with Mr. Moran over the telephone. * * * With very few exceptions I had very poor success in getting into communication with him at all until about the fore part of August. * * * It was in the fore part of August, I couldn't state exactly the day. * * * I went out to Mr. Moran's house, * * * he promised me then as he had promised me a number of times before that he was going to resume the work immediately. * * * My argument with

him, which he acquiesced in, was the fact that the quicker that he got the job through the less money he would lose. * * * The conditions were such that it was apparent about the last of June or first of July that the work could not be completed by August first."

Plaintiff's witness, Thomas M. Campau, the engineer it employed to prepare the specifications and superintend the contract, testified that the real work was not begun until between June 20th and July 1st and owing to the delay in starting it was apparent the job would not be done strictly within the terms of the contract; that he urged Moran to start paving as soon as the shovel was out of the way, about two weeks after it started, so that he might get through before frost set in, although Campau knew it could not be finished by August 1st because of the delay in starting.

George Cook, called by plaintiff, testified that Spitzley requested him to bid on finishing the contract, pointed out the work already done and stated he either had or expected low figures on the job; that in making his estimates according to the contract specifications he took into consideration the work done by the previous contractor and based his bid, made in the fall of 1916, on what remained to be done; that it was a reasonable bid from plaintiff's point of view but not so for him as he subsequently discovered for it proved unprofitable owing to the rapid change in conditions, with increase in prices and decrease in efficiency of labor; that the cost of labor and material began to rise in 1915 and kept increasing; that in October, 1916, the going cost of excavation on jobs like this was 30 cents a yard and in March, 1916, when Moran took the contract it was about 25 cents. Spitzley was familiar with and testified to this constant rise in cost of contracting owing to the world war, and said of it that in the building business "every three or four

months the price would jump up 10 or 15 per cent. It never went down." Campau also testified to the same effect and estimated an increased cost for excavation of 25 per cent. from the fall of 1916 to the spring of 1917.

Clearly under such conditions it was not an unnatural nor supertechnical precaution to provide in an indemnity bond for faithful performance of an improvement contract that the surety should be promptly notified of any breach of the contract or any other act or omission on the part of the principal which might involve or cause a loss for which the surety might be answerable. The reason for requiring such notice, even in normal times when not accentuated by the uncertainties of rapidly rising prices resulting from conditions caused by a great war, and the permissible method of construing it in practical application are thus stated in *Hormel & Co.* v. *Bonding Co.*, 112 Minn. 288 (128 N. W. 12, 33 L. R. A. [N. S.] 513):

> "The object of requiring notice to be given of the contractor's default which may involve loss was to enable the surety company seasonably to take such practicable action as might prevent or minimize loss by reason of the default, and it is not to be strictly construed for or against either party, but reasonably as to both. So construing it, it is clear that the provision for immediate notice does not require notice to be given instantly upon learning of the default, but that it should be given within a reasonable time in view of all the circumstances."

Unquestionably the requirement that notice of default be given "immediately" does not in the connection used mean "without any time intervening" or "instantly" as the lexicographers define the word; but it being plainly the purpose and intent of such provision that prompt notice should be conveyed to the surety to enable it to take all then available steps for its protection, a fair construction of the condition

precedent to that' end is that the parties intended and understood it to mean the notice should be timely or promptly given, without unnecessary delay and with reasonable diligence. Plaintiff's own testimony shows failure in those particulars. Timely warned by prompt notice of the situation the surety, with its right to take possession and complete the contract in case of default, could have conferred with the contractor before his resources were exhausted and he had "moved off the job," about August 6th as he states, and aiding or co-operating with him might have pressed the work to completion in such an uncertain time of increasing prices with much less loss than resulted.

Spitzley himself, early knowing of delays and familiar with existing conditions, of which the surety was not advised, recognized a probable loss and the advisability of prompt action while Moran was yet on the job, urging him that the quicker he got through the less money he would lose, and says, he "came to the conclusion that they (the improvements) could not be put in (that summer) unless Mr. Moran got busy the fore part of August"; but no notice of delays, Moran quitting the job, or any other default was given the surety in compliance with the condition precedent until on, or after August 30th, although the conditions as known to Spitzley had become such by the last of June or first of July that it was apparent the work could not be completed by August 1st.

In *Gamble-Robinson Co.* v. *Insurance Co.*, 113 Minn. 38 (129 N. W. 131), immediate notice to the surety of default by the principal was required. The employer learned of the default upon which his claim was predicated the latter part of August and neglected to notify the surety until September 28th. It was held as a matter of law that under the circumstances a delay of approximately one month was unreasonable and discharged the surety. That court is in substan-

tial accord with this on the rule of construction applicable to conditions precedent in the bonds of sureties for hire. In *Hormel & Co.* v. *Bonding Co., supra,* a delay of 20 days was held to release the surety, the court saying:

"The very purpose of the notice was to enable the surety company to investigate, exercise its judgment, and take steps to avert the threatened loss. The owner could not speculate upon the probability of loss, but was bound to give the notice as required by the contract."

Here the owner not only speculated upon the probability of loss, but apparently appreciated that under existing conditions it was inevitable and the sooner the job was finished the less the loss would be. It is more than a presumption in this case that between the time that knowledge came to the owner of delays, omissions and breach of the contract on the part of Moran and the time at which the required notice of the same was given to the surety, there was such change in the cost and conditions that the surety would in all reasonable likelihood be seriously prejudiced by the delay. It is shown that during the summer and fall of that year, as for some time before and since, the market for labor and material was rising. Moran's contract price for this job, in March, 1916, was $26,238.62. Cook's contract price of October, 1916, for finishing the work, which proved unprofitable, was $35,694.10. Campau's estimate for the work Moran had done was $4,050. This would make the total cost of the finished work, as required by Moran's contract, $39,744.10, or an increase in cost above his contract price of approximately 50 per cent.

Under the undisputed facts in this case the trial court rightly held as a matter of law that plaintiff prejudicially neglected to promptly and within a reasonable time give the surety due notice as contem-

plated in the contract between the parties. Under the circumstances shown such palpable and prejudicial default in a material condition precedent was a substantial breach of the contract which discharged the surety.

As to the second proposition, counsel for defendants make no argument in their brief against plaintiff's contention that the judgment against Moran should under the undisputed evidence be the difference between his contract price and what full performance actually and necessarily cost plaintiff, or in other words the increased cost of the work to plaintiff by reason of Moran's default. This plaintiff's counsel compute at $9,494.48, and by the figures defendants' counsel apply it amounts to $9,455.48. It was stated by defendants' counsel in oral argument that as to plaintiff's claim in that particular Moran did not desire reversal or re-trial on that issue but consented to the increase of judgment for which plaintiff contends. If plaintiff so desires, the judgment will be remanded with direction to the trial court to enter judgment in its favor against Moran for the increased amount claimed, otherwise the judgment as to him will stand reversed and a new trial granted with costs of this court to plaintiff.

The judgment of the trial court dismissing the case as to the defendant surety is affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.