The CITY LOAN AND SAVINGS COM-
PANY, Plaintiff,

v.

The EMPLOYERS' LIABILITY ASSUR-
ANCE CORPORATION, LIMITED,
Defendant.

Civ. No. 8250.

United States District Court
N. D. Ohio, W. D.

April 21, 1964.

634

Ross W. Shumaker and Robert G. Clayton, of Shumaker, Loop & Kendrick, Toledo, Ohio, and Harry R. Meredith, of Meredith, Meredith & Tait, Lima, Ohio, for plaintiff.

William S. Burton and Joseph A. Rotolo, of Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, and G. P. Openlander, Toledo, Ohio, for defendant.

BATTISTI, District Judge.

Trial by jury having been waived by the parties, and the Court having heard the testimony of witnesses, reviewed the transcript of the evidence and exhibits, considered the briefs, proposed findings of fact and conclusions of law submitted by each of the parties, and heard oral arguments of counsel, makes the follow-

ing findings of fact and conclusions of law:

## FINDINGS OF FACT

### (A) THE PARTIES AND BONDS IN SUIT

1. Plaintiff is a corporation organized in 1912 under the laws of the State of Ohio governing building and loan associations, with its principal office in Lima, Ohio. It is and was in the relevant years a stock company, authorized to receive and receiving deposits from the general public, but is, and has been since its incorporation, engaged in the personal loan and finance business in the State of Ohio, and in the relevant years maintained and operated branch offices for carrying on its business in approximately 150 locations throughout the state—at least one branch being located in each county of the state. It is licensed under the Small Loan Act of Ohio to carry on its direct loan business, and is under the supervision of the Superintendent of Building and Loan Associations, and of the Division of Securities of the State of Ohio. (Plaintiff's Proposed Finding of Fact No. 1.)

2. The defendant is a corporation organized under the laws of the United Kingdom of Great Britain and Ireland, with its principal place of business and chief office for the United States in the City of Boston, Commonwealth of Massachusetts. It is licensed to do business and is doing business in the State of Ohio, and in the Northern District thereof, including the furnishing for compensation of surety and indemnity bonds of the type herein involved. During the relevant years it was represented in part by an agency at Lima, Ohio, known as The Gooding Company, with F. E. Gooding of that firm as an agent or attorney-in-fact for the defendant. (Plaintiff's Proposed Finding of Fact No. 2.)

3. On May 8, 1957, the defendant, by and through its agent, said F. E. Gooding, executed and delivered to the plaintiff in Lima, Ohio, its Primary Commercial Blanket Bond No. F 154564, to become effective on May 15, 1957 (PX 1).

The bond provided indemnity for plaintiff against any loss of money or other property which it, as the insured, shall sustain and discover as provided in the bond to an amount not exceeding in the aggregate $900,000.00 through any fraudulent or dishonest act or acts committed by any one or more of the employees of plaintiff, as defined in the bond, acting alone or in collusion with others, during the term of the bond. (Plaintiff's Proposed Finding of Fact No. 3.)

4. The main bond in suit (PX 1) contained a provision headed "Indemnity Against Loss Under Prior Bond or Policy" which referred to prior bonds issued by defendant to plaintiff effective May 15, 1951 (PX 2, 3) which were renewed in May 1954 for an additional three year period. These two prior bonds preceded immediately the bond in suit in point of time, and were cancelled as of May 15, 1957, the date when the main bond in suit became effective. These two prior bonds indemnified plaintiff against the same type of loss as the bond in suit. Premiums for these two prior bonds upon their issuance and renewal, were duly paid by plaintiff to defendant (PX 8, 9 and 10). The bond in suit, when it was cancelled by defendant on October 1, 1958, and a portion of the premium therefor in the amount of $24,319.56 for the period after October 1, 1958, were returned to plaintiff.

5. All claims of loss asserted by plaintiff in this action, based upon the fraudulent and dishonest acts of employees, arose during the period of these three bonds and the amount of the claims for any date or period does not exceed the limit of the bond in effect when the several claims of loss arose or occurred. (Plaintiff's Proposed Finding of Fact No. 6.)

### (B) NATURE OF THE CLAIM

6. Plaintiff first gave defendant notice of the dishonesty upon which its claim is based by a letter dated June 9, 1958. Plaintiff claimed to have first discovered the dishonesty of its involved employees within a week prior to June 9,

1958 (PX 12). Plaintiff mailed its Proofs of Loss to defendant on January 8, 1959 and February 3, 1959 (PX 28 and 29).

7. Defendant refused to pay the claim as set forth in the Proofs of Loss, although it has never denied that dishonesty had occurred. Plaintiff brought suit for the net sum of $352,304.57 plus interest before judgment at 6% from the date when suit could first be brought under the terms of the bonds.

8. Plaintiff's claim is based on losses alleged to have been sustained through the dishonesty of C. J. Lonsway, the manager of plaintiff's Painesville, Ohio branch and other City Loan employees acting under the direction of Lonsway in Painesville in collusion with Jack Herman Motor Sales, Inc., a used car agency to and through which plaintiff extended its indirect contract and wholesale loan services. The claim is based on transactions and accounts dating from February 14, 1953, through June 5, 1958 as listed in the Proofs of Loss.

9. Although the parties are not in agreement as to the ultimate facts or the legal conclusions which flow therefrom, there was little or no significant conflict in the evidence as to the operative or underlying facts concerning the transactions between C. J. Lonsway and Jack Herman. Thus, in this area the Court need only rely on the testimony of plaintiff's own officers and witnesses, forms and documents prepared by plaintiff, and the unrebutted testimony of the witnesses Frank Gill and Florence Herman who had knowledge of the details.

10. Plaintiff loaned money to borrowers or customers at the statutory rates of interest on (a) direct loans, (b) indirect loans, and (c) wholesale or floor plan loans. Direct loans were made direct to the customer, and were ordinarily secured by mortgages on chattel property. Indirect loans were made to finance purchases by retail customers from dealers in chattel property, including used automobiles, for which a finance charge was made and included in the amount of the note executed by the customer. Upon the sale of retail installment contracts to plaintiff, the dealer was required to endorse the customer's note and mortgage in one of three ways, (a) with no further recourse, (b) limited recourse, and (c) with full recourse. When the commercial paper was so endorsed, delivered to and accepted by plaintiff, the dealer received the unpaid balance to be financed. The finance charge was an amount received by plaintiff from the customer along with the principal of the loan, paid in monthly installments over a period of months. (Plaintiff's Proposed Finding of Fact No. 9.)

11. C. J. Lonsway became manager of the City Loan Painesville branch upon its opening in 1939 and continued as manager until discharged June 5, 1958. About 1949, the Painesville branch began business dealings with a particular used car dealer in Painesville, Jack Herman Motor Sales, Inc. (hereinafter referred to as "JHMS"). That company was owned principally by Jack Herman and Florence Herman, his wife, who were its president and secretary. JHMS soon produced a large volume of used car business and the Painesville branch undertook to finance this dealer by floor plan loans and to purchase its retail installment sales contracts. (Plaintiff's Proposed Finding of Fact No. 20.)

12. At first this business was transacted on a legitimate basis. However, beginning in 1951 the manipulation of certain accounts between Lonsway and JHMS began. (Plaintiff's Proposed Finding of Fact No. 21.) This manipulation originated in the need of JHMS for money with which to conduct its business and from the desire of Lonsway to keep from reporting to the Home Office, as delinquent, genuine indirect loans on which the original customer had ceased to make payments for a bona fide reason not connected with dishonesty. (Plaintiff's Proposed Finding of Fact No. 22; Lonsway 288–89, 427, 399–400; Gill 1942). When the dishonest transactions became so numerous it was no longer possible to carry them in the memories of the conspirators, Lonsway initiated

the preparation at the end of each month secret documents described and known as "28th lists". (PX 32; DX 13; Plaintiff's Proposed Finding of Fact No. 22; Lonsway 366–67, 293, 384, 332). At first this list was small. It increased with time as the collusion kept pyramiding out of a need for funds with which to make payments on accounts placed on "28th lists" for previous months (Lonsway 332; D'Antoni 680).

13. The desire of Lonsway to have his office reflect a high volume of indirect contracts and yet a low delinquency rate was the purpose of the "28th lists" and was in line with City Loan's announced policy of aiming for a high volume with low delinquencies (Lonsway 393–94; Teehan 781). The number of accounts on the "28th lists" grew until the list for the month of May 1958 contained 18 direct accounts and 274 indirect accounts and required aggregate payments for that month of approximately $20,000. (Plaintiff's Proposed Finding of Fact No. 25.)

14. All funds used to make payments on the "28th list" accounts came through JHMS or from the Hermans personally (Lonsway 287, 331–32, 359).

15. Originally all the accounts on the "28th lists" were genuine accounts upon which the genuine customer had ceased to make payments. The monthly payments necessary to continue those accounts were originally obtained from the proceeds due to JHMS from the subsequent sale of the car received or taken back from the defaulting customer, which cars JHMS was allowed to keep and sell instead of being required to turn them over to City Loan for a formal repossession sale. The proceeds from sales of such cars by JHMS were "sprayed" over many 28th list accounts in amounts sufficient to make individual monthly payments in full on each listed account. As the number of such accounts increased, and when it became apparent that the proceeds from the second sale of the car by JHMS seldom equalled the ledger card balance due on the original contract, other sources of funds were sought each

month to make the required payments on the "28th list" accounts. Originally, such other sources were the monies due to JHMS from City Loan as the result of the purchase of perfectly legitimate accounts or from perfectly legitimate floor plan loans. JHMS had hundreds of such legitimate deals every year. This was the most economical way for JHMS to obtain money to keep up the "28th list" payments (Lonsway 395–97; Herman 1963; Amiott 596–97; D'Antoni 621–22; Gill 1924). As additional funds were needed, the proceeds of pay out checks received from credit unions, banks and other sales finance companies which had refinanced the automobile for the original purchaser were used to "spray" payments over the "28th list" accounts, with the account for which the check had been received left open on the books but placed on the "28th lists" for later payment in full by JHMS. Whereas the refinance pay-out check would be merely for the principal amount due plus short-rated unearned finance charges, the obligation undertaken by JHMS for future payments on that type of "28th list" account included the principal balance due plus the full amount of the remaining finance charges over the entire period of that account. (Lonsway 296, 397–99, 427–33, 400–01; Herman 1961; Wilkins 1539–45). Finally, Lonsway and JHMS resorted to the preparation of fictitious accounts, that is the preparation of notes and mortgages purportedly executed by a bona fide customer and floor plan loans purportedly made to JHMS representing either nonexistent automobiles or already floor planned automobiles. (Plaintiff's Proposed Findings of Fact Nos. 23, 26, 27; Lonsway 397–99.)

16. The fictitious indirect accounts were developed for the purpose of raising funds to apply to "28th list" accounts. They were not developed until late in the scheme when other sources of funds were not enough, since this was the most expensive way for JHMS to raise the money to apply to "28th list" accounts inasmuch as JHMS thereby only received the balance to finance as paid out by City

Loan on such accounts; whereas the obligation of JHMS to repay those fictitious accounts included both the principal amount "borrowed" plus the entirety of the finance charges. The development of fictitious accounts began in approximately 1955. (Lonsway 289, 398, 399–401.) There was a heavy concentration of fictitious accounts created during the period from January through May 1958. Even so, fictitious accounts constitute less than half of the indirect accounts on which plaintiff makes claim. Of the 264 indirect accounts included in the original Proof of Loss, 132 were originally genuine accounts on which the genuine customer had ceased making payments. Ninety-two were fictitious accounts. Thirty-eight were originally genuine accounts which were allowed to be processed completely even though the customer did not intend to finance the indicated purchase through City Loan. The proceeds of these thirty-eight accounts were sprayed on "28th list" accounts. Two were of an undetermined nature. All of the 11 direct accounts on which City Loan makes claim were originally genuine accounts on which the original customer had ceased making payments and which were placed on the "28th lists" for payment by JHMS (Lonsway 439; Meredith 1387). The decision as to whether a Proof of Loss indirect account was fictitious or not was made by plaintiff's own accountant, Easton, based solely on the information he found in the City Loan account-by-account memoranda contained in the individual account jackets and other information furnished by City Loan (DX 66; Easton 1570–72, 1573, 2217–17A, 2223–24). A chronological listing of the 266 indirect accounts on which plaintiff makes claim reveals the development and steady "mushrooming" of fictitious accounts only in the later years. (DX 64, 65; Easton 1618–20, 1630, 2222–23.)

17. Funds obtained from the sources listed above were applied to "28th list" accounts to keep up the payments on such accounts. There was no proof that either Lonsway or JHMS ever received any of such funds for personal use (Lonsway 437–38, 359). JHMS received City Loan checks on the fictitious accounts and on the hundreds of legitimate indirect accounts sold to City Loan each year, but no City Loan checks were issued unless City Loan obtained in return either a legitimate obligation for which a genuine customer was responsible or a fictitious contract on which JHMS was responsible to make payments by "28th" means until the account was paid in full (Herman 1946, 1963; Amiott 599, 602; D'Antoni 642, 664, 672). Some of such City Loan checks issued payable to JHMS were endorsed back to City Loan for "spraying" on the "28th list" accounts; others were cashed. It was perfectly natural for City Loan to cash checks for dealers and customers (Amiott 608). No cash was given to the Hermans unless it was for a check or other obligation of equal amount (Amiott 602; D'Antoni 642, 664, 672; Herman 1946). The cashing of checks for customers or dealers did not in any way affect the daily "cash up" (D'Antoni 637–38). The cash-up figures were never forced (D'Antoni 652). There is no claim made by plaintiff of any shortage of cash or currency inasmuch as every cash disbursement made by the Painesville office whether made by check, the cashing of checks or otherwise and whether honest or dishonest in nature, was supported by an equal obligation which was carefully recorded and carried on the books of City Loan until paid (Meredith 1415–16; Franklin 1024–27; Easton 1592). The City Loan Proofs of Loss reflected all amounts claimed to be due to it as of June 5, 1958 as the result of the dishonesty of employees in its Painesville office.

18. On indirect contracts, the Home Office forwarded a coupon book to the customer with individual coupons to be submitted with each monthly payment. The payment was recorded in the stub of the coupon book. The coupon was then detached for forwarding to Lima (Timmermeister 32–34; PX 16). When the customer forgot his coupon book,

City Loan issued a "temporary receipt" in duplicate which served the same function as the regular coupon, a copy of the temporary receipt going to the customer and the original being sent to Lima (Timmermeister 70). Whenever an account was paid in full in advance of the time when the last payment was due, a City Loan form known as a "pay-out slip" was given the customer evidencing the receipt by City Loan of a payment sufficient to pay the account in full. Whenever the ledger card on an indirect account was reduced to zero because of a pay-out payment made in advance of normal maturity, a copy of the pay-out slip was given to the customer and the original thereof was sent to Lima to support the daily receipts listed on the Cash and Bank Report which had to be in balance (Timmermeister 84–85; D'Antoni 669).

19. Inasmuch as payments made on all dishonesty manipulated accounts had to be reported to the Home Office and inasmuch as the report of payments thereon had to be accompanied by a document evidencing the exact amount of the payment, temporary receipts evidencing each payment were issued to the Hermans when payments were made by "28th" means with copies thereof being sent to Lima attached to the daily Cash and Bank Report (D'Antoni 634–35, 670; Herman 1946, 1950; Lonsway 359, 360). Whenever the Hermans made payments on "28th list" accounts, for which they did not have the coupon book, Mrs. Herman always insisted upon and was always given a temporary receipt. A temporary receipt or pay-out slip was never obtained by the Hermans unless the amount of the payment to City Loan indicated thereon had in fact been received by City Loan (Lonsway 359–60; D'Antoni 634–35; Herman 1946, 1950, 1952). The disappearance of an account from the "28th lists" established it was paid in full and that City Loan had received either the entire ledger card balance including the entire amount of finance charges shown on the original note or the full "pay-out"

balance required to close out the account (Lonsway 375–76, 382).

20. Florence Herman, the secretary and bookkeeper of JHMS who made the payments on the "28th list" accounts made an effort to retain all of the temporary receipts and pay-out slips she received. Many of these temporary receipts and pay-out slips were received into evidence at trial as plaintiff's exhibit 137 A through F. These temporary receipts and pay-out slips evidenced payments which had been made by or on behalf of JHMS to City Loan between September 1950 and June 1958 in the total amount of $1,135,356.55. They represent payments as made on the 277 accounts listed in plaintiff's Proofs of Loss, on 122 direct loans not listed in the Proofs of Loss and for which no claim is made, and on 1,264 indirect contracts not listed on the Proofs of Loss and for which no claim is made. These temporary receipts and pay-out slips established that payments were made by "28th" means on a cumulative total of at least 1,663 separate accounts (Hodgins 2052, 2057, DX 88). After eliminating all pay-out slips and the temporary receipts attributable to Proof of Loss accounts, the temporary receipts establish that payments totalling $330,466.99 were made on 693 different indirect non-proof of loss accounts which were paid in full by 28th means and for which plaintiff makes no claim (DX 88; Hodgins 2053–56).

21. A statistical tabulation by account number and customer name of the bulk of these temporary receipts and pay-out slips for non-proof of loss accounts was sent to City Loan in November 1962 (DX 29, 29A, 30; Meredith 1178–84, 1310–11; Hodgins 2054–55). An additional list containing some seventy additional accounts was presented to City Loan the day prior to trial (DX 31, 1178–84). The evidence showed through cross-references to certain account cards retained by City Loan that the account numbers and customer names contained in such tabulations referred to previous accounts which had been

serviced by the City Loan Painesville office and which had been previously paid in full. (DX 38, 39; Meredith 1315–17, 1352). The account numbers and customer names shown on the statistical tabulation of these temporary receipts and pay-out slips tie into the "28th lists" (DX 13). These temporary receipts and pay-out slips represent accounts, all of which had been paid in full without the realization by City Loan of any charge-offs due to losses thereon. Had there been any such charge-off, Mr. Meredith admitted City Loan usually retained the note and mortgage thereon. Meredith looked through the City Loan records and found plaintiff did not have notes or mortgages on any of the non-proof of loss accounts listed in the statistical tabulation of temporary receipts and pay-out slips. (Meredith 2170–71, 2178–79, 2180).

22. Plaintiff's claim consists of (a) $330,907.23 representing the net balances due on 266 indirect accounts as of June 5, 1958, (b) $4,644.35 representing the net balances due on 11 direct accounts as of June 5, 1958, (c) $43,042.00 representing the net amount due on wholesale loans to JHMS as of June 5, 1959, and (d) $11,560.00 representing two JHMS checks, which were returned unpaid after June 5, 1958, and which are claimed to be part of a dishonest check float or exchange between C. J. Lonsway and JHMS.

23. Defendant asserted several defenses under the terms of the bonds, and asserted that no overall loss had in fact occurred by reason of the various credits which it urged be applied against the amount of the claim. Separate findings of fact as to these defenses and credits are set forth below.

(C) EVENTS LEADING UP TO, ON AND AFTER FEBRUARY 23, 1956.

24. Each of the bonds in suit provides:

"This bond shall be deemed cancelled as to any Employee: (a) immediately upon discovery by the In-sured, or by any partner, or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee." (Conditions and Limitations, Sec. 12.)

"At the earliest practical moment, and at all events not later than fifteen days after discovery of any fraudulent or dishonest act on the part of any Employee by the Insured, or by any partner or officer thereof not in collusion with such Employee, the Insured shall give the Underwriter written notice thereof * * *". (PX 1, 2, 3, Conditions and Limitations, Sec. 15.)

"No Employee, to the best of the knowledge of the Insured, or of any partner or officer thereof not in collusion with such Employee, has committed any fraudulent or dishonest act in the service of the Insured or otherwise." (Conditions and Limitations, Sec. 14.)

25. C. J. Lonsway was the manager in charge of plaintiff's branch at Painesville, Ohio for approximately nineteen years (PX 49). During that time, he developed the financing of indirect contracts resulting from the retail installment purchases of automobiles in Painesville from practically zero to over $2,000,-000 annually (Lonsway 337).

26. Indirect loans result from the purchase by City Loan of retail installment contracts from dealers who have presented a completed Sales Credit Application to a City Loan branch manager for approval (Meredith 1215, 1217). The Sales Credit Application was a City Loan form. It contained personal and credit information as to the customer, a description of the car purchased, the sales price, sales tax and insurance costs, the amount of the down payment, the description and value of any automobile traded in, with the resultant amount being the balance to be financed (DX 18). To this was attached a note and mortgage in the amount of the balance to be financed plus plaintiff's finance charges and other miscellaneous charges (DX

18). The branch manager was authorized and required to sign his approval on the Sales Credit Application. His signature, when affixed, represented an approval of the original transaction, an agreement to purchase the contract and a certification regarding the reliability of the data which appeared on the document itself (Teehan 814–15, 833–34). The approval by the branch manager was all that was needed to authorize the loan and was by admission of plaintiff's President, "significant" since, once it was approved, City Loan was committed to buy the contract (Meredith 1214). The approved Sales Credit Application was then forwarded to the home office in Lima, but by that time the disbursement of the purchase price by the branch office had already occurred. (Meredith 1076 1223).

27. City Loan branch managers were provided each month with National Automobile Dealer's Association guides which contained the current loan value for the car being purchased by the customer and the wholesale value of any car traded-in in connection therewith (Teehan 700; Dawson 1986–88). Plaintiff's Sales Credit Application carried a box for the insertion of such NADA information (D X 18; Teehan 802). These guides were admitted to be City Loan's "control" as to the loan value and resale value of a given car (Lonsway 422–23; Teehan 771). In addition, plaintiff issued manuals which set forth its rules and policy in connection with the amount which could be loaned on a given car on a given guide value (Teehan 753–54, 975–76).

28. On every used car transaction City Loan required a special form entitled "Inspection and Appraisal Report" (Form L–294) known as the "pink slip" (DX 14; Teehan 844; Meredith 1224; Lonsway 447; Gill 1882). The purpose of the pink slip was to inform the Home Office of the condition of the used car being offered as security and to indicate the existence of extra equipment, if any, which might have an effect upon the loan value of the car. City Loan required that a "pink slip" executed by the branch manager or assistant manager accompany each Sales Credit Application sent to Lima upon the completion of the purchase of an indirect contract involving a used car (DX 14; Meredith 1077, 1243–45). The person filling in and signing the pink slip prior to making the certification required by the form, was supposed actually to see and inspect the car so as to verify and appraise its condition and its extra equipment (Meredith 1244–45; 1260–61; Gill 1882). The pink slip was one of the significant items in making the loan (Meredith 1259). The appraisal and the inspection required to be noted thereon was, by the admission of plaintiff's President, "very significant" (Meredith 1328–30). It was the only document by which the security for the loan was certified (Meredith 1251; Lonsway 452). City Loan required sufficient security on used car loans (Teehan 780, 856). Specific instructions were given in the City Loan Policy Manuals as to the completion of the Inspection and Appraisal Report and as to the method of inspection (Teehan 856–65, 867–70). The manuals stated that the inspection was required on "every occasion—no exceptions" since the purpose of the pink slip was a "safety measure against over-loans" (Teehan 857, 868). These requirements were in effect prior to and during February 1956. City Loan relied on the inspection and appraisal report at that time (Teehan 858–59, 870–71).

29. In the Home Office, the Sales Credit Application and the Inspection and Appraisal Report where checked (Meredith 1216–62; 1263–65). Where the values reported or the amount disbursed by City Loan exceeded the values listed in the NADA guides and the company manuals, the employees reviewing the documents stamped the Sales Credit Application "exceeds guide value" (Teehan 775).

30. Every day, starting in October 1955 and continuing through late February 1956, loan documents stamped "exceeds guide value" were brought to the attention of J. A. Teehan (one of plain-

tiff's officers and head of the sales finance department) by his assistant. These loan documents all related to indirect contracts on used automobiles which had been purchased from a single dealer, JHMS (Teehan 717, 776–79, 850–51). From his experience with NADA guide values and from data appearing on the face of the loan documents as purchased from JHMS, Teehan noted misrepresentations in the form of inflated values. He brought these misrepresented documents to the attention of the president of City Loan. Meredith agreed the documents revealed on their face that fictitious values had been reported to the Home Office (Teehan 717, 722, 853; Meredith 1320–21, 1076).

31. These daily misrepresentations were identified in Lima after the sales price of the car sold, the value of the car traded in, the sales tax paid thereon, and insurance (Teehan 717–19, 722; Meredith 1071) had all been established, and the contract had been purchased by the Painesville office (DX 18). These fictitious values misrepresented the value of the security City Loan had acquired for the loan (Meredith 1331–32, 1350–51). Plaintiff's officers admitted the amount of inflation of values was "considerable" (Meredith 1269), that the loan documents revealed a "terrific pack" (PX 55; Teehan 851), and that the misrepresentation of values thereon was between $500 and $600 above guide values on challenged accounts (Meredith 1328–30). For used cars, the maximum loan limit in City Loan's Manuals was guide value plus insurance (Teehan 760–768). This was City Loan's "control" and it was "very unusual" for a branch manager to exceed such limits by even as much as $300 (Teehan 771–73). There were admittedly "hundreds of accounts" brought to the attention of Teehan from October 1955 to February 1956 in which the data was thus "fictitious" (Teehan PX 55; Meredith 1274).

32. The inflation of sales price values on the loan documents resulted in a misrepresentation of the value of the security which City Loan required for all loans (Meredith 1331, 1350–51; Teehan 780, 856). Such misrepresentations resulted in City Loan paying out more money on purchased contracts than it would have, had the value of the security been honestly reported. It is admitted that the officers of City Loan knew this as soon as they knew of the inflation of values (Teehan 989, 994). The inflated values of trade-ins as shown on the loan documents, resulted in a misrepresentation as to the equity which the customer had in the car being purchased and again resulted in City Loan paying out more money than would have been required under an honest reporting of values (Teehan 834–35, 994). It was obvious to City Loan's officers, by their own admission, that the degree of inflation was such in many cases as to cover up the fact that the customer had made no down payment at all (Meredith 1328–30, 1331). The customer's equity in the car was important to City Loan (Meredith 1334). City Loan never authorized loans without down payments, and indeed, required them (Meredith 1342–43). According to Meredith, no finance company wants to finance a car when the purchaser has no equity in it (Meredith 1330–31). Meredith admitted that when an automobile having a true guide value of $2100 is sold without down payment or trade-in, if the sales price is misrepresented by $600 (to $2700) and a fictitious down payment or an inflation of the trade-in value by $600 is reported, the lender advances $2100 on a security worth only $2100, whereas the reported values would indicate the lender had $2700 security on a $2100 loan and the customer had a $600 equity (Meredith 1282–83, 1343–44).

33. Meredith noted that "practically every car" among the transactions challenged had extra equipment listed on the Inspection and Appraisal Report as signed by Lonsway sufficient to raise the value of the car by $500 to $600 (Meredith 1284, 1321–24, 1328–30).

34. By February 1956 it became obvious that City Loan was in danger of losses due to such misrepresentations

(Meredith 1350) although no loss had as yet been noted. The officers were concerned inasmuch as a "substantial loss" could occur and City Loan "would be headed for trouble" if such fictitious data continued (Teehan PX 55). Lonsway had signed and approved the loan documents on the challenged accounts (Teehan 814–15; Meredith 1333–34). Plaintiff's officers admitted they knew, when they discovered that the figures on the face of the loan documents purchased from JHMS were consistently misrepresented, that Lonsway had approved them (Teehan 814–15, 834, 837–38). Lonsway was experienced regarding car values (Teehan 833). Plaintiff wrote to Lonsway for a justification for having purchased accounts based on values inflated above NADA values (Teehan 851), and for a justification of "that kind of price", but Lonsway's answer did not satisfy plaintiff and Meredith admitted he "still thought it was too much money" (Meredith 1334–36). Normally, according to Meredith, unless the manager "gives a very, very good reason for justifying the account" he "wouldn't last very long" (Meredith 1338).

35. Meredith took the matter up with the City Loan Operating Committee (Teehan 851). Thereafter, Teehan and Meredith went to Painesville for the express purpose of cutting off JHMS as a dealer from whom they were purchasing contracts (Teehan 721; Meredith 1071). That decision was made before leaving Lima since it was admittedly obvious to Meredith and Teehan in Lima from the face of the loan documents, which had been approved by Lonsway, that the reported values had to be fictitious (Teehan 721, 838). Such a trip to a branch office by two chief officers of City Loan was "unusual" (Meredith 1338). Plaintiff, for its own protection wanted "fact" not "fiction" on loan documents, which managers had approved and on which they had disbursed funds (PX 55; Teehan 855–56). Plaintiff did not want documents misrepresented (Meredith 1331; Teehan 994, 989). The decision to investigate the operations of the Painesville office by a surprise trip was reached despite Lonsway's written explanations prior to the trip that these were "good deals", explanations which were rejected by Meredith (Meredith 1335–36).

36. In addition to the daily misrepresentations of values approved by the Painesville office between October 1955 and February 1956, Meredith and Teehan were also concerned prior to their unusual trip with other aspects of the Painesville operation which had been discovered from records sent to Lima by that office. They had discovered that completed loan documents originating from JHMS had been forwarded after the disbursement of City Loan funds, but many days before the noting of a lien in favor of City Loan on the applicable certificates of title (Teehan 905–06, 920, 923; Meredith 1368). This was a "dangerous practice" since there was no security for the funds City Loan had paid out until and unless a valid title was obtained and a lien noted thereon (Teehan 905). Since late 1955 the Painesville branch records had revealed what appeared to be a check exchange, or "float", between Lonsway and JHMS wherein JHMS would give its check in payment of a floor plan loan and relatively simultaneously would negotiate a floor plan loan in an almost identical amount and receive City Loan's check therefor (DX 17, JHMS floor plan ledger cards; Teehan 829–93, 898; Meredith 1102–03).

37. Teehan and Meredith went to Painesville on February 21, 1956 and there told Lonsway what they had discovered and that they intended to cut-off JHMS as a dealer. Lonsway was "receptive". He complained of the time it took to service the JHMS accounts (Teehan 720–21, 728; Meredith 1080–81). However, Lonsway again insisted that each challenged account was a genuine good account and that he could justify every one of them (Meredith 1081, 1339–40). Meredith admits he still was not satisfied with Lonsway's assurances and wanted to talk to Jack Herman (Mere-

dith 1341). They went to Herman and discussed the matter with him, including the extra equipment reported on practically every one of the cars sufficient to raise the purported sales value of used car deals purchased from JHMS by as much as $500 to $600, which equipment had been certified by Lonsway in his Inspection and Appraisal Reports as submitted to Lima (Meredith 1284, 1321, 1333–34; Teehan 814–15, 834). Herman admitted the challenged accounts had been misrepresented in exactly the manner Teehan and Meredith had believed they were even before they made the trip to Painesville (Meredith 1084, 1342).

38. Meredith and Teehan both admitted they realized that Lonsway knew of, allowed, and had approved these misrepresentations and the fictitious information as to extra equipment, value, condition of car, sales price and trade-in. They testified that Lonsway "had to know" because he was as experienced as they were in loan and security values and in recognizing deals which were dangerously in excess of guide values. Yet Lonsway had knowingly approved transactions in which the loan documents certified by Lonsway showed figures dangerously in excess of actual guide values (Teehan 883, 987–89; Meredith 1084, 1274–78, 1328). As to the fictitious $500 to $600 of extra equipment reported on practically every car, Lonsway had either not inspected the car and yet certified on the Inspection and Appraisal Report that he had, or had inspected the car but certified that he had seen extra equipment which was in fact non-existent. The extent to which City Loan consistently relied upon the certifications in the "pink slip" Inspection and Appraisal Report (Form L–294) is shown by the questions later asked by Meredith of Lonsway on June 5 and 6, 1958, during the "confession" taken from Lonsway by Meredith:

"You did sign saying you had inspected. Had $1,900 appraisal on it. And you sent it through the mail knowing it was fraudulent". (Page 42, PX 27.)

With regard to another account, Meredith stated during the confession:

"On your certification on this Carl Morse, you certified this is a brand new car and you knew that was not true." (Page 32, PX 27.)

As to still another account, during the confession Meredith stated:

"Now you approved that deal because on Form L–294 you initialled it?" (Page 22, PX 27.)

Regarding those statements concerning the "pink slip" during the Lonsway confession, Mr. Meredith testified:

"I was relying on him knowing about it, *that is where I caught him in the lie.* * * * " (Meredith 1480)

39. Herman protested being cut-off as a City Loan dealer in the light of his excellent record, and reminded the officers that City Loan had "never lost a dime" on a JHMS account (Meredith 1083). Herman offered to sign an agreement indemnifying City Loan in the event City Loan realized any loss on accounts originating from him; whereupon Lonsway immediately "changed his tune" and, also pointing to the excellent profit record enjoyed by City Loan on JHMS accounts, asked the officers where City Loan could ever replace Jack Herman's volume (Meredith 1085–86; Teehan 723). Despite tremendous competition in the sales finance field, and despite the fact City Loan's finance charges were as high or higher than any other competitor in Painesville, no other competitor in that area had the volume of plaintiff's Painesville branch (Timmermeister 10; Lonsway 340–42). The goal of City Loan was volume with a low delinquency or charge-off experience (Teehan 781). JHMS was the "key account" in Painesville; it generated the volume, there being no other volume dealer in that office (Teehan 781–82). It was producing 600 to 650 new indirect accounts per year (Teehan 712–13). It generated a yearly loan balance average

of 2¼ million dollars (Teehan 782–84; DX 25(9B)). This was a "terrific volume" (Haubert 484). JHMS was about the best dealer City Loan had financially (Teehan 789). It was a profitable relationship which City Loan wished to retain (Teehan 790). The indirect accounts JHMS generated had such a minor delinquency and charge-off experience in relation to the volume produced that it made Herman the "star of a star office" (Teehan 723–27, 746, 786, 787–88).

40. In the light of these considerations, and although no loss had yet been noted, it was recognized that a loss might have occurred or would occur, and Meredith prepared an agreement which Herman and his wife signed personally on February 23, 1946. This agreement indemnified City Loan "from loss due to such past misrepresentations and to insure it against further occurrences in that regard" (PX 48, Meredith 723). The representations referred to in the indemnify agreement all concerned City Loan's security for the loans (Meredith 1350–51). Lonsway agreed to protect City Loan's interest in the future, and with Herman, agreed to correct the above practices (Teehan 723, 728–29, 906).

41. City Loan never gave notice to the bonding company of the facts discovered in Lima and in Painesville prior to and on February 21–23, 1956 (Meredith 1100).

42. On April 4, 1956 Teehan wrote to Meredith concerning the check exchange or float he had suspected before the Painesville trip stating: "I am satisfied [Herman] is working on a float" since "it is a matter of record that there are not sufficient funds in the bank to cover [his checks] at the time they are accepted" (Teehan PX 60).

43. In May 1956, the William Burchett (87A–12991) indirect account was brought to the attention of Meredith (Kaple 1757, 1765–66). The Sales Credit Application showed an indicated cash down payment of $1,056.65 on a car purchase dated November 1955, yet the customer had ostensibly allowed the car to be repossessed three months later without making a single payment thereon and was, without objection, letting his substantial cash down payment go "down the drain" (DX 40; Kaple 1757–64). Painesville requested a $798.36 charge-off on the account due to a repossession sale which had produced that much less than the balance City Loan showed due on the account (Kaple 1761–63). City Loan doubted that a customer would allow that to happen, or that this 22 year old customer ever had sufficient ready cash to make a down payment in excess of a thousand dollars (Kaple 1764). Without first making any inquiry of Lonsway, in fact ignoring Lonsway, Meredith instructed home office representatives, Garrigus and Kaple, to go to Painesville to check the Burchett account (Kaple 1765–66). They went directly to Jack Herman who admitted the reported figures were fictitious. They took no further action with respect to these dishonest figures, which had been previously certified as valid and genuine by the Painesville office, when Herman agreed to pay the difference between the amount loaned and the amount recovered on the repossession sale (Kaple 1766–69).

44. On June 20, 1956, Teehan wrote to Painesville and again noted that "*day after day* Jim Sterling questions contracts which you purchase from Herman \* \* \* I can readily understand why he questions them." (DX 26). This Home Office memo discusses repeated late noting of liens, the disbursement of funds without first noting the City Loan lien on the certificate of title, the continuing practice of purchasing accounts for amounts over the guide values of the cars involved and concludes "the dealer is definitely working on a float".

45. A year later, in August 1957, Meredith and Teehan sent a fifth Home Office representative, Hoffman, to investigate matters in Painesville (Teehan 739, 887–888, 935; Meredith 1364). Hoffman was given express instructions to bypass Lonsway in his investigations (Meredith 1366, DX 25(17A)). Neither

Lonsway nor Haubert, the district manager, were advised of when or why Hoffman was being sent (Teehan 887–88). Hoffman spent two weeks in Painesville. He typed his own reports. He discussed nothing with Lonsway (Lonsway 352–53). Such an investigation from the Home Office without notice to and discussions with the branch manager or the district manager was a "special situation" (Teehan 935). No other branch or volume dealer had ever been checked in that manner (Haubert 538).

46. Teehan issued written instructions to Hoffman (DX 25(17–A to H)). Hoffman wrote reports of his findings (DX 25(9A to H)). Meredith read both the instructions and reports (Teehan 923–24, 934–35; Meredith 1101, 1364, 1366).

47. Teehan's instructions to Hoffman included the following:

"We have been concerned about the Painesville operation for sometime, especially the Jack Herman operation. * * * I am not in favor of having you take Cy or Gill with you on this assignment * * * I think there is a float some place * * * it is unusual for him to pay-off without applying for another wholesale loan immediately. *Do they have the titles when he applies for a loan?*" (DX 25(17A)).

"The fact that they have contracts from 15 to 45 days before they note the lien *leads me to believe the reason they do not note the lien is they do not have the titles.*" (DX 25 (17D)).

"I will still say there is a float in this operation." (DX 25(17B)).

"Decided to pull all active ledger cards on the [Jack Herman] account; analyzed them very carefully and the report is very revealing. * * * In arriving at the delinquency * * * we find that very few are in trouble, *unless the dealer has repossessed some of the cars open, paying them out on a monthly basis and the office failed to report the repossessions.* This is something else we recommend that you check on while you are in Painesville next week." (DX 25 (17G)).

48. Hoffman's reports included the following:

"I have thoroughly analyzed this office's procedures in handling the Herman account, both wholesale and retail * * * From 1–1–55 to 7–1–57 we have taken contracts totalling $5,484,000. So far this year Lonsway has between $3,000 and $4,000 charge-offs on Herman's accounts. This would appear to me to be a minor loss considering the tremendous volume. * * * This connection has been profitable for us so far." (DX 25(9B)).

"After review of your file, I know that you suspect that Herman is working the 'float'. *This is true!* * * * Without question Mrs. Herman made the wholesale loan so that a deposit could be made so that their check would clear." (DX 25(9B)).

"I think that you will agree that your audit of Herman's accounts, * * * and my report of last week proves conclusively that the connection has been profitable for us." (DX 25(9F)).

"In short, we have advised both the Hermans that, in the future, we will advance money when they present a title, no other way. Lonsway has assured me that he will follow this rule. Herman is not provoked with us and I'm positive that we have done nothing to curtail our volume" (DX 25(9F)).

"We know Herman is working with a limited amount of capital. He is working a check 'float'. This is a hazard which we must be aware of at all times in the future dealings with him. But I do not think that he would be able to continue with us if we should put him on a cash basis. It seems to me that the

volume of retail contracts which we have, and will continue to enjoy somewhat compensates us for this risk; it is a calculated gamble. We have built up a margin, however small for the contingency, but it should offer some protection for the check 'float' as it increases. I believe that we should keep in mind, when analyzing the value of this connection to Painesville that we cannot replace it with a connection of equal volume in this community. In summary, we know Herman's reputation, his short-comings and his value to us. Let us continue. With this knowledge and our eyes open to the danger signals, if and when they occur, we should be able to correct in time to avert the possibility of loss." (DX 25(9H)).

49. The check "float" and the disbursement of loan funds without first having in hand the certificate of title which Hoffman was requested to investigate and report on in August 1957 were admittedly conditions which had led Meredith and Teehan to their initial determination to cut-off Herman as a dealer prior to their February 1956 trip to Painesville and which they inquired into during that trip (Teehan 892–93, 898, 905–06, 920, 923; Haubert 554, 557). They were among the practices Lonsway had agreed in February 1956 to stop (Teehan 723, 728–29, 906). They were among the practices Teehan wrote to Lonsway about again in June of 1956 (DX 26).

50. On February 27, 1958, two years after Teehan and Meredith's trip to Painesville, the Home Office required Haubert, the district manager, to investigate and report to Teehan and Meredith on the same practices which Lonsway had repeatedly been ordered to stop and which Lonsway had agreed to stop; the check "float" and the disbursement of City Loan funds without having received a title (PX 52; Haubert 564–68). In addition, Haubert again reported that the "cars have not been inspected according to our policy" (PX 52). Once again,

Lonsway was told he had to cease these practices, and once again, he agreed to stop (PX 52).

51. The claim in this case includes $11,560 allegedly based on the "check float" (Meredith 1377–78). It includes at least $148,797.07 based on claimed balances due on admittedly fictitious accounts where City Loan did not have title to the security since there had never been a customer who purchased the indicated automobile, as Teehan suggested might be the fact on June 20, 1956. (DX 26; DX 66; Haskins & Sells working paper No. 1, Summary of Claim on "F" Accounts.) It includes $130,548.70 based on 131 originally genuine accounts on which the customer refused or failed to make further payments, but on which Lonsway allowed or required Herman to take the car, sell it, and keep up the monthly payments so that no delinquent report on such accounts was ever sent to Lima, all as suggested might be the case by Teehan in DX 25(17G); DX 66, Summary of Genuine Accounts; DX 91, column 15.

52. According to the City Loan account by account memoranda, the dishonesty complained of occurred prior to February 23, 1956, on only two Proof of Loss accounts: Kirby Newsome, Account No. 87–A–12247, Proof of Loss No. 162, and John Major, Account No. 87–A–13488, Proof of Loss No. 144. The combined City Loan claim on these two accounts is $548.90. The combined City Loan claim on Proof of Loss indirect accounts regarding which the dishonesty complained of occurred *after* February 23, 1956, is $329,952.83. (Proofs of Loss, PX 38 and DX 66, Haskins & Sells working paper No. 1.)

53. Based on the above operative facts, the Court finds that prior to and on February 23, 1956, Meredith and Teehan had actual knowledge of specific acts of dishonesty by C. J. Lonsway, and that such knowledge was additionally amplified by the events herein noted which continued to occur for at least two additional years.

(D) EVENTS CONCERNING FIRST NOTICE OF DISHONESTY GIVEN BY PLAINTIFF IN 1958

54. The bonds in suit provide:

"At the earliest practical moment, and at all events not later than fifteen days after discovery of any fraudulent or dishonest act on the part of any Employee by the Insured, or by any partner or officer thereof not in collusion with such Employee, the Insured shall give the Underwriter written notice thereof * * *". (PX 1, 2, 3, Conditions and Limitations, Sec. 15.)

Plaintiff first gave notice of dishonesty to defendant by a letter dated June 9, 1958. The testimony as to the events leading up to June 9, 1958 is not in conflict with the exception of two matters to which these findings will allude hereinafter. Except as to those two matters, the following findings are based solely on the testimony of plaintiff's own witnesses, officers and present managers and on that testimony of defendant's witnesses which was uncontroverted.

55. Frank Gill was the assistant manager of plaintiff's Painesville office from 1954 to April 1, 1958 when he was transferred to a City Loan branch in Toledo (Gill 1874–75, 1877). During that time he had full knowledge of the manipulation of accounts by Lonsway and Herman and, at the direction of the manager, Lonsway, had prepared some of these accounts (Gill 1913, 1916). Gill took with him to Toledo three "28th lists", and several inter-office memoranda so as to show which accounts were involved in case he was ever accused of anything (Gill 1920–21).

56. From 1955 to March 1959 the branch manager at the Toledo (Huron Street) office was H. Glenn Smith.

57. City Loan held a state-wide meeting for branch managers at the Deschler-Hilton Hotel in Columbus, Ohio on Wednesday and Thursday, May 21 and 22, 1958 (Meredith 1184). Approximately ten days prior thereto Gill told Smith all he knew about the dishonesty in Painesville, including the preparation of the "28th lists" of which he had copies (Gill 1892, 1918–19; Smith 1851). Vernard Moats, the City Loan district manager covering the Toledo branch, admitted that at the managers' meeting in Columbus on May 21, 1958, H. Glenn Smith disclosed to him all the information he had received from Gill, including Gill's possession of the "28th lists", Lonsway's involvement and the fact that fictitious accounts were involved (Smith 1851–54; Moats 1795–9⁷, 1803, 1807, 1845). This was admittedly important to Moats since it involved an employee in his district and he had never in his life received information of such moment, particularly as to fictitious accounts (Moats 1809–10, 1845). Moats admits he thereafter contacted Paul Fletcher, Vice President of City Loan and the Officer in Charge of Personnel within five minutes (Moats 1843). He told Fletcher what Smith had said, indicating that it involved more than just a violation of company rules (Moats 1811–12). There is no dispute that thereafter, on the same day, Moats put Smith in touch with Vice-President Fletcher and that Smith did talk to Fletcher (Moats 1811, 1813–14; Smith 1853–54; Fletcher deposition, PX 139 at p. 38). There was a conflict as to whether Smith talked to another officer, Meredith, as well, and as to what he revealed to whomever he talked. Smith's testimony, to the effect that he talked to both Fletcher and Meredith and revealed all he had learned from Gill as to the manipulation of accounts, the "28th lists", fictitious accounts, and Lonsway's involvement (Smith 1855–57; 1860) must be recognized as correct. Plaintiff's own proposed finding of fact (No. 35) acknowledges that "officers" were involved and that "Smith imparted what Gill had told him to the officers."

58. Fletcher wanted to immediately call in Lonsway, who was attending the managers' meeting, and confront him with the information (Smith 1858, 1865–66). Meredith decided to wait until the end of the month when the manipulation was being done by Lonsway so that they

could "catch him in the act" (Smith 1859, 1867).

59. Moats testified on deposition and at trial that "immediately" after the conclusion of the managers' meeting on May 22, 1958, he called Meredith by telephone (Moats 1816–17, 1820–25). As a result of this phone call, a specific appointment was made to bring Gill to the Home Office in Lima the next day (Moats 1829). On deposition and in his initial testimony at trial, Moats stated that the phone call to Meredith was no more than one-half day from the first time he talked to Smith (Moats 1817, 1823–24). Moats' testimony at all times was that he first talked to Smith at the managers' meeting on May 21 or 22 (Moats, 1796–97, 1803, 1817). It was not until later in his testimony that he claimed that the "immediate" phone call was not one-half day later, but eight days after, on May 28th or 29th (Moats 1818–26). He was "unable to recall the circumstances of why he waited eight days." (Moats, 1820). Based on his original testimony, based on the fact his original testimony was in accord with Gill who testified he was taken to the Home Office on May 23, 1958 (Gill 1893, 1925), the Court finds that Gill was taken to Lima on May 23, 1958. In Lima, Gill met with Meredith, among others (Gill 1894; Moats 1828–29). Meredith admits he had by that time already detected that on many JHMS accounts the same car was simultaneously listed on several different mortgages (Meredith 1103–04) "and it was through the checking of those individual ledger accounts that [Meredith] knew something was wrong in Painesville, whether it be Gill or Lonsway." (Meredith 1104). There could not be more than one legitimate mortgage on the same automobile as City Loan would already hold the title as a result of the original mortgage and JHMS could not deliver a title for a duplicate or triplicate genuine mortgage on the same car. When Gill arrived in Lima, Meredith had a group of JHMS ledger cards on his desk (Meredith 1104; Moats 1829). The questions by Meredith and the statements by Gill involved the matching up of the JHMS cards which Meredith had with him and the "28th lists" which Gill brought with him. The discussion also involved how the "28th lists" totalling possibly as much as $275,000 each, were operated and prepared monthly, how genuine accounts were manipulated after they became delinquent because of customer nonpayment, how fictitious accounts were created, the source of money used to make payments on "28th list" accounts, and the manipulation of the recording of liens and Lonsway's participation therein (Meredith 1103–04, 1106–07, 1459–60; Moats 1829, 1830–32; Gill 1895–98). Gill left the "28th lists" with Meredith (Gill 1896).

60. While Moats and Gill were still present, there was a discussion in Lima of how the matter would be brought to a head. It was then decided to bring Lonsway to Lima on June 5, 1958 on a pretext. (Gill 1906–07; Moats 1832–33; Meredith 2173–74). This was done. After Gill's visit to Lima, but before Lonsway was brought in on June 5, 1958, Meredith told Vice President Fletcher that he was "positive" that there was dishonesty in Painesville (Fletcher deposition, PX 139 at p. 28). When Meredith first arranged to send four auditors into Painesville at a time when he knew Lonsway would be in Lima, he admits he was "satisfied with [Lonsway's] crookedness" (Meredith 1110), Meredith made arrangements to send the team of Home Office auditors between May 29 and June 3, 1958 (Kaple 1774–76).

61. In Lima, on June 5 and 6, 1958 Lonsway admitted to all the details Meredith had learned from Gill, from the "28th lists", and from JHMS ledger cards and accounts (PX 27).

62. Defendant was first notified of this matter by a letter from John Timmermeister, Treasurer, dated June 9, 1958 (PX 12).

63. The Proofs of Loss disclose that claim is being made by plaintiff in this case for substantial amounts which the

Proofs of Loss show did not even originate until *after* May 23, 1958, including, but not limited to, the following indirect accounts:

| P/L No. | Name of Account | Date of Account | C/L Claim |
|---|---|---|---|
| 62 | Evans, William | 5/26/58 | $3,225.00 |
| 73 | Fox, Lester | 5/26/58 | 1,700.00 |
| 75 | Freund, Steve | 5/24/58 | 2,626.00 |
| 90 | Green, Sidney | 5/26/58 | 1,226.50 |
| 130 | Krutchok, Karl | 5/29/58 | 2,424.00 |
| 161 | Moss, Carl | 5/27/58 | 3,030.00 |
| 207 | Roth, Murray | 5/28/58 | 2,950.00 |
| | | | $17,181.50 |

64. The Proofs of Loss also disclose that claim is being made by City Loan on two JHMS checks payable to City Loan totalling $11,560, which were not paid by the bank on which drawn (PX 28, 29, 30, 31). Plaintiff claims those two checks were given by Jack Herman in "exchange" for four City Loan checks given to Herman totalling $11,630. (PX 117, 118, 119, 120). The four City Loan checks payable to Herman which were allegedly given in exchange for the two unpaid Herman checks are dated June 3 and June 4, 1958—i. e. after May 23, 1958.

(E) ORAL AND WRITTEN REPRESENTATIONS MADE BY PLAINTIFF AS TO AUDITS TO BE CONDUCTED

65. On May 15, 1957, the indicated effective date of the bond in suit, Allyn Crooker was the bond manager in defendant's Columbus, Ohio office. (DX 75, 76; Crooker 1672–73, 1688–90). Prior to May 15, 1967, Crooker made specific inquiries as to the internal financial controls maintained at plaintiff's branches

(Crooker 1698, 1739). Internal controls are crucial to the risk in the operation of a sales finance company such as City Loan. Upon inquiry by Crooker, Timmermeister represented there would be frequent audits of cash and accounts by City Loan's own staff at all City Loan locations (Crooker 1698, 1739). Crooker as the manager in charge of issuing the bonds, relied on that representation by Timmermeister before issuing the bond (Crooker 1701). Additionally, Crooker relied on and transmitted that representation to prospective re-insurers prior to the issuance of the 1957 bond in an attempt to re-insure part of the risk, as was a requirement of the defendant (DX 77; Crooker 1701, 1707, 1708).

66. On May 21, 1957 plaintiff, through its Treasurer, Timmermeister, filled out and executed defendant's standard form of application (DX 3; Timmermeister 96). Therein plaintiff repeated and formalized the previous representation that there would be a frequent audit of cash and accounts at all its locations by City Loan's own staff, specifically:

"4   Audits

(a) How frequently made?

Cash and Accounts

at least annually

(b) By whom? CPA; Staff Auditor; Others—(explain fully)

State B & L Dept. Frequent audits by own staff

(c) Are all locations included?

Yes."

67. There was no testimony that any official inspections of City Loan operations made either by the Ohio Superintendent of Building & Loan Associations or the Ohio Division of Securities were audits. The inspections by the Building & Loan officials covered only the three branches, of plaintiff's 150 branches, where savings deposits were accepted and concerned only that aspect of plaintiff's business (Meredith 1040). Inspections by the Division of Securities concerned only plaintiff's direct loan operations, was only a "spot check" and did not involve the inspection of any branches (Timmermeister 58–59).

68. There were never any audits of any portion of City Loan's operations conducted by independent auditors prior to the engagement by plaintiff of Haskins & Sells beginning in 1960 (Meredith 1170, 1185).

69. Under generally accepted definitions and standards as to what constitutes an "audit" the auditor must outline the scope of his work and give his opinion as to the results of his work (Wilkins 1537). There must be tests of the practices and procedures used (Wilkins 1537–38). If an audit of cash and accounts is to be made, an actual verification of cash is the beginning of any true audit. A physical examination of cash is essential to make any procedure an audit of cash (Priscilla 2095).

70. All branch offices of City Loan were required to send a daily written report to the Home Office on a cash and bank record form (DX 2). The preparation and submission of this daily report was not an audit of cash and accounts under any accepted definition of the word "audit" (Priscilla 2093–94). A daily review of this daily report was not an audit of cash and accounts under any accepted definition of the word "audit" (Priscilla 2094–95). The lack of physical examination of the reported cash in the Home Office review is one of the missing factors (Priscilla 2095; Kaple 1781).

71. The Home Office of City Loan exercised control over its branches directly through 13 district managers or supervisors, each having supervision over one of the 13 geographical districts into which plaintiff's branches were grouped. (Plaintiff's Proposed Finding of Fact No. 11). It is admitted that, from 1955 through 1958, whatever internal "audits" were conducted of branches were done by the district managers (Haubert 512–13; Meredith 1185). From 1955 through 1958, the district manager was required to visit and inspect each branch in his *own district* once a year with the date left to the discretion of the manager (Haubert 475–76; 513).

72. Richard Haubert had been a district manager for City Loan since 1951. In 1955 he became district manager for District 13 in which the Painesville branch was located (Haubert 471–72).

73. The annual inspection by the district managers between 1955 and 1958 was "for one purpose only"—to coordinate the individual account balances reflected on the Home Office ledger cards with those on the branch office records (Haubert 475, 518). This was a clerical verification of bookkeeping entries only (Keough deposition, DX 92, p. 510). There was nothing required to be done other than to transcribe the account balances on the branch records on to individual slips and to forward them to the Home Office where they were checked against the balances shown for the respective accounts at the Home Office (Haubert 528; Keough deposition, DX 92, p. 510). The balances listed on the account ledger cards had nothing to do with cash (Haubert 533). Such a mere comparison of account balances was not an audit of cash and accounts under any accepted definition of the word "audit" (Priscilla 2066–68).

74. From 1955 through 1958 there was no requirement for Haubert to check and verify the cash in the Painesville office, nor did he ever do so (Haubert 519–22; D'Antoni 655, 658). There was no requirement that he check the floor plan loan documents and he did not do so (Haubert 519–22). There was no requirement that he check the branch bank account,

nor did he do so (Haubert 523). There was no requirement that he check delinquent accounts, nor did he do so (Haubert 526). There was no requirement that he check whether manual procedures were being followed, nor did he do so (Haubert 526). There was no requirement that he check the floor plan inventory on the dealer's lot, nor did he do so despite the fact that the only way to detect a discrepancy in the floor plan was to take a physical inventory (Teehan 806–810; Haubert 527). There was no requirement that he check for the existence of a float or kiting of checks, nor did he do so and, in fact, he would not know how to make such an investigation in any event (Haubert 528). There was no requirement that he make any report to the Home Office concerning the results of his annual inspection other than the routine forwarding of the account balance slips (Meredith 1185–86; Haubert 514–15, 535).

75. Haubert admitted that the annual inspection by district managers between 1955 and 1958 was not a true audit at all (Haubert 528). The procedures followed by the district managers in their annual inspections of branches between 1955 and 1958 was not an audit of cash and accounts in the branches under any accepted definition of the word "audit" (Priscilla 2068–69). Even the use of moderate accounting controls, let alone a frequent audit of cash and accounts by City Loan's own staff would have revealed at least one or more of the seven different categories of repeated and unusual transactions which are listed in defendant's Exhibit 90, the Report on Certain Accounting Procedures, issued by Ernst & Ernst on September 22, 1960, which transactions all had relation to the manipulation of accounts (Priscilla 2070–72). The seven categories are:

1. Excessive deposits over loan collections—Excessive checks issued over loans made.

2. Summary of cash [excessive] held overnight.

3. Checks held overnight for deposit.

4. City Loan checks to City Loan for cash.

5. Summary of disbursement involving Jack Herman Motor Sales, Inc.

6. Disbursements on automobile contracts—sales tax.

7. Daily Branch Journal, 28th payments.

76. Through Timmermeister in 1957 was Treasurer of City Loan and the person in charge of bonds at City Loan, he made the representation that there would be frequent audits of cash and accounts at all City Loan branches at a time when he had no close dealings with, and was not close to the affairs of the branches (Timmermeister 30). He was, even at trial, unaware that the annual inspection procedures which he thought were in effect in 1955 and 1958 were those not put into effect until 1959 (Timmermeister 97–98, 132; Keough 510, 512–14; Haubert 475, 512, 514–16, 526–27, 519, 528–29, 535, 537; Meredith 1185–86; 1192–93).

(F) BOND COVERAGE AS TO "EARNED" INTEREST

77. The City Loan Summary of Loss, as adjusted by its own accountants, Haskins & Sells, includes $37,628.72 representing the calculated total interest and net finance charges "earned" as of June 5, 1958 with respect to all of the direct loans and indirect accounts listed in the Proofs of Loss; viz. $2,504.67 "earned" interest on direct loans, plus $35,124.04 "earned" net finance charges on indirect accounts (PX 104–B and PX 28; Meredith 1151–54; Easton 1555).

78. Plaintiff's property consisted of cash, government bonds, funds out on loan, real estate and furniture and fixtures. (PX 18, 19, 21; Plaintiff's Proposed Finding of Fact No. 8.) The interest and finance charges collected by plaintiff on outstanding loans and accounts was one of the sources of plaintiff's profits. It was plaintiff's practice at the end of each month to transfer to earnings on its books all interest and finance charges earned as of that date. Dividends to shareholders and the rate

of interest to be paid on deposits would be in part determined by earnings although the record is silent as to what the actual facts were in this regard. (Timmermeister 8–9, 36–42, 43–47; Meredith 1047; Plaintiff's Proposed Finding of Fact No. 8.) This monthly crediting of earned interest to earnings was permissive only, and not required by law or by plaintiff's by-laws (Timmermeister 126). The plaintiff is required by statute to maintain a reserve for losses which, as of December 1958 amounted to approximately $9,000,000 (Meredith 1236; Keough 522). The total amount of the claim in this case was long ago charged-off against this statutory reserve for losses of the type here claimed (Wilkins, 1524–25).

79. The bond in suit and all prior bonds issued by plaintiff to defendant agreed to indemnify plaintiff:

> " * * * against any loss of money or other property, real or personal (including that part of any inventory shortage which the Insured shall conclusively prove has been caused by the fraud or dishonesty of any Employee or Employees) belonging to the Insured, or in which the Insured has a pecuniary interest, or for which the Insured is legally liable, or held by the Insured in any capacity whether the Insured is legally liable therefor or not * *. (PX 1, 2, 3.)

Each of the bonds in suit by rider attached expressly provides:

> "The attached bond shall be subject to all its agreements, limitations and conditions except as herein expressly modified." (PX 1, 2, 3.)

80. Plaintiff's own Proposed Finding of Fact No. 17 recognizes that neither the bonds in suit, nor any prior bond issued to City Loan by defendant, contained any provision extending coverage to City Loan permitting the retention by City Loan, as an asset, of any profits, i. e. interest or finance charges received on dishonestly manipulated accounts during the period of dishonest manipulation prior to the discovery thereof, either in the body of the bond or in any rider or endorsement thereto. (Plaintiff's Proposed Finding of Fact No. 17; Crooker 1724–25, 1737, 1682; Shumaker 1057.)

81. At the time when plaintiff first obtained its fidelity coverage from defendant in 1937, plaintiff obtained from defendant certain letters which were entirely separate and apart from the bond in question and which plaintiff acknowledges were a separate "understanding." These letters constituted a recognition by defendant that, with respect to claims made under the 1937 bond of defendant, the interest and finance charges received by plaintiff on manipulated accounts during the period of dishonest manipulation were, upon discovery of the irregularities, to be retained by plaintiff as though such interest and finance charges had been legitimately earned. In case of loss, payment to plaintiff under such separate understanding as to manipulated accounts was to be made on the basis of the amount of unpaid principal due thereon as of the date of discover, as shown by the books of plaintiff. (Plaintiff's exhibit 28, Original P/L attached Affidavit, p. 4; DX 43, 45.)

82. In 1956 Frank J. Kvatek was defendant's claims agent and supervisor of claims in the Cleveland office. He had authority to take a position on behalf of the defendant as to bond coverage. (Kvatek 143–45, 1646–47, 1654.) Beginning at least as early as 1956, with the claim made by plaintiff in connection with a loss at its Barberton office, defendant, through Kvatek, informed plaintiff that defendant's bond did not extend beyond its express terms and did not permit plaintiff to retain interest "earned" and collected on dishonestly manipulated accounts prior to the discovery of dishonesty as had previously been done under the memoranda "understanding" which applied to the 1937 bond (Crooker 1675–76; Kvatek 1646–48). As a result of that position, Meredith wrote to Kvatek on December 5, 1956 stating: "There is room for argument on the point" and agreed to make a final claim under the Barberton, Ohio loss for only the principal balance due on the dishonest accounts

*less* interest paid thereon during the dishonest manipulation thereof (DX 68, 69). The amount was paid by defendant (Kvatek 1649–53). Because of the position taken by Kvatek, Meredith again wrote to defendant on December 12, 1956, outlining the separate "understanding" reached on the interest question by way of separate memoranda in 1936 and 1937 and inquiring "what position you are taking now and in the future." (DX 57; Meredith 1442–44; Kvatek 1647–48).

83. Negotiations were had between the parties during 1956 and thereafter relative to increasing the bond limits to $300,000 in January 1957 and the issuance of the final bond with limits of $900,000 in May 1957. Several meetings were had between the parties wherein Meredith repeatedly requested that City Loan be furnished with letters of understanding in 1957 similar to and equivalent in content to the letters of understanding which had been furnished by defendant in 1936 and 1937 with respect to the way in which interest and finance charges on manipulated accounts were to be treated in computing claimed losses under previous bonds. (Meredith 1041–46; 1056; Crooker 1677–1680, 1714–15; Kvatek 1653–55.) Crooker and Kvatek repeated their position that defendant could not and would not give such a separate commitment with its proposed new bond. (Kvatek 1655; Crooker 1680.)

84. Because the Board of Directors desired a determination of the interest question prior to the issuance of a new bond, because Meredith had confirmed his position that interest should be treated as formerly contemplated under the separate memoranda from defendant's agents in 1936 and 1937 and because Kvatek and Crooker had taken equally strong positions both in connection with the Barberton loss and in the several meetings in 1957 with Meredith that interest would not be treated according to the 1936 and 1937 separate understandings, Crooker wrote a letter on April 4, 1957 on the subject (PX 75; Crooker 1731, 1744, 1747). The letter stated defendant "will, in the future, as heretofore, settle all valid claims in accordance with the conditions and limitations and agreements provided in Blanket Position Bond and Primary Blanket Bond."

85. By letter dated April 8, 1958, Meredith rejected and physically returned defendant's letter of April 4th and requested that defendant write a different letter using substitute language suggested by Meredith and stating that "if" defendant did so, the substitute language suggested by Meredith "would be acceptable to our company and would be fair to your company." (DX 58; Meredith 1447.) Neither defendant nor any one else connected with defendant ever wrote any additional letter containing the substitute language requested by Meredith. (Gooding 260–61; Crooker 1742–43, 1746.) The bond in suit dated May 8, 1957 and effective May 15, 1957 was accepted by plaintiff as submitted by defendant without any interpretive letter in existence relative thereto. (Crooker 1747; Meredith 1451.)

(G) FINANCIAL "CREDITS" CLAIMED BY DEFENDANT

86. The defendant has submitted considerable evidence on seven theories which, if valid, would require credits totaling $365,800.88. In view of the foregoing Findings of Fact, it seems unnecessary to determine the validity of defendant's theories on which the claims for credits are based. However, without deciding the merits or the validity of the credits and theories on which they are based, the Court simply notes that they consist of credits for:

(1) Normal business losses on 131 Proof of Loss accounts in the amount of $130,548.70;

(2) Interest paid by "28th list" means on Proof of Loss direct loans in the amount of $1,866.00;

(3) Interest paid by "28th list" means on non-proof of loss direct loans in the amount of $4,428.48;

(4) Finance charges paid by "28th list" means on indirect Proof of Loss contracts in the amount of $28,118.63;

(5) Finance charges paid by "28th list" means on non-proof of loss indirect accounts in the amount of $48,149.04;

(6) Jack Herman reserve and returned checks in the amount of $21,-563.03; and

(7) Business losses on repossession or resale of the security on non-proof of loss "28th list" accounts which City Loan was "spared" in the amount of $131,127.00.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the action, of the parties and of the subject matter of the suit. The amount of plaintiff's claim for loss and damage caused by fraud and dishonesty of its employee C. J. Lonsway does not exceed the amount of the coverage of the main bond in suit and of the prior bonds which, but for the defenses of the bonding company which are the subject of a later conclusion by this Court, were in effect at the time said fraud and dishonesty occurred.

■ (2) There can be no recovery for any loss due to the dishonesty of C. J. Lonsway under the bonds in suit by reason of the actual discovery by the officers of City Loan of specific acts of dishonesty as of February 23, 1956 and, again, thereafter, all as found by this Court in its Finding of Fact Nos. 24 through 53. Such discovery voided coverage of the bond issued as of May 15, 1957 and, hence, voided all prior bond coverage, as to C. J. Lonsway, by reason of the warranty by plaintiff contained in the 1957 bond. Such discovery terminated bond coverage, as to C. J. Lonsway, under the bonds issued both prior to and on May 15, 1957 by the express terms of the bonds concerning termination. In addition, such discovery, without notice to the surety until June 9, 1958, precludes recovery for the dishonesty of C. J. Lonsway under any of the bonds in suit by reason of the notice provisions of the bonds.

(3) In the light of the great attention given to the discovery defense by both parties, the Court deems it advisable to discuss its conclusion.

■■ (4) The bonds in suit are and are to be construed as contracts between the parties thereto binding them in accordance with their terms. First National Bank of Van Wert v. Houtzer, 96 Ohio St. 404, 406–407, 117 N.E. 383 (1917); 50 O.Jur.2d, Suretyship, §§ 22, 23. These bonds expressly required that plaintiff give the defendant written notice "at the earliest practical moment, and at all events not later than 15 days after discovery of any fraudulent or dishonest act on the part of any Employee." This was a condition precedent to recovery. Kornhauser v. National Surety Company, 114 Ohio St. 24, 150 N.E. 921 (1926). The bonds in suit also provide that they "shall be deemed cancelled as to any Employee * * * immediately upon discovery by the Insured, or by any partners, or officers thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee;" Finally, the bonds in suit, particularly the bond issued as of May 15, 1957, also contained a warranty by plaintiff that "No employee, to the best of the knowledge of the Insured, or any partner or officer thereof not in collusion with such Employee, has committed any fraudulent or dishonest act in the service of the Insured or otherwise." Plaintiff has at no time challenged the existence or validity of these contractual provisions.

(5) Nor has plaintiff ever challenged the fact that, as provided by the express terms of the bond, the knowledge or discovery of dishonesty by "any officer" of plaintiff would constitute knowledge of or discovery by plaintiff itself.

(6) It is to be specifically noted that both the warranty, the condition requiring notice and the termination provisions of the bonds in suit turn not upon the discovery of a loss, but simply upon the knowledge or discovery of dishonesty. Hence, while this Court has found that the officers of City Loan had actual knowledge of specific acts constituting dishonesty, it does not and need not find that they had knowledge that an actual

loss had already occurred. In that regard, however, the Court notes that the indemnity agreement prepared by Mr. Meredith on or before February 23, 1956 which Jack and Florence Herman signed did contain a specific provision indemnifying plaintiff against "loss due to such past misrepresentations". Messrs. Meredith and Teehan admitted, in testimony and in correspondence received into evidence, they were fearful that City Loan was in danger of substantial losses from such misrepresentations. While the express terms of the bonds require that there only be knowledge of dishonesty, and not that there be knowledge of a loss, this admitted fear of the officers of City Loan adds another perspective to the actuality of their knowledge of dishonesty as found by this Court.

■■ (7) "Dishonesty", as used in a fidelity bond, is to be interpreted according to its usual and ordinary meaning. First National Bank of Van Wert v. Houtzer, 96 Ohio St. 404, 117 N.E. 383 (1917); Appleman, Insurance Law and Practice, Vol. 9, § 5668, p. 512 (1943). To constitute dishonesty, the conduct need not amount to a crime and need only involve bad faith or a want of integrity or untrustworthiness or a disposition to lie or cheat or a faithlessness to a trust. State ex rel. Neal v. State Civil Service Commission, 147 Ohio St. 430, 72 N.E.2d 69 (1947), (adopting definition in Black's Law Dictionary, 3rd Edition); Mortgage Corporation of New Jersey v. Aetna Casualty & Surety Co., 19 N.J. 30, 115 A.2d 43 (1955); Appleman, Insurance Law and Practice, Vol. 9, § 5668, p. 512 (1943). To constitute dishonesty, there need not be an intent to profit or to cause a monetary loss to the employer. Mortgage Corporation of New Jersey v. Aetna Casualty & Surety Co., 19 N.J. 30, 115 A.2d 43 (1955). The facts as actually discovered by the officers of City Loan prior to, as a result of, and subsequent to their trip to Painesville in February 1956 were specific facts of dishonest conduct. The fact that Lonsway had lied as to each challenged account being a genuine and justifiable good account before Herman admitted they were falsified, the fact that Lonsway had knowingly permitted falsified documents and values to be the basis of the disbursement of City Loan funds, the fact that Lonsway had permitted a check float, the fact that he had falsely certified to having inspected the security, and the fact that he had falsely certified the existence of nonexistent extra equipment on the security were all facts admittedly known to the officers of City Loan and were all specific acts of dishonesty.

(8) While the officers of City Loan denied the ultimate fact that they had knowledge of dishonesty, such ultimate fact and the conclusion based thereon follows inevitably from the operative or underlying facts found by this Court. As to what occurred prior to and on February 23, 1956, those underlying or operative facts are solely those testified to by the officers of plaintiff or as appear from the manuals, forms and correspondence of the plaintiff. As to what occurred after February 23, 1956, those operative or underlying facts are solely those testified to by plaintiff's officers and present employees and as appear from plaintiff's own records and correspondence.

■ (9) Nor can the ultimate finding of actual knowledge of dishonesty be avoided by the fact that the practice of inflating the value of the car sold and the car traded in is common in the automobile sales industry and accepted by sales finance companies. First of all, the type of inflation admitted to have existed in this case was not merely a type of puffing to delude the gullible buyer into thinking he had received a "good deal" on his trade-in. It was admitted by Messrs. Teehan and Meredith that the misrepresentations of Lonsway were of a type calculated to conceal from his employers to whom he owed a special duty of disclosure the fact that the customer had made no down payment or had no trade-in at all and [was] calculated to serve as the basis for a larger disbursement of City Loan funds than City Loan would have otherwise permitted had the values been reported honestly. Secondly, plain-

tiff, in its own Proposed Finding of Fact No. 18, at least goes so far as to admit:

"This practice, which is commonly known and experienced by finance companies purchasing indirect contracts from automobile dealers, was tolerated by City Loan *within reasonable limits*. In February 1956, the home office in Lima became aware that Jack Herman Motor Sales, Inc. was misrepresenting—inflating or puffing—the value of cars being sold and the value of down payments and trade-ins *in excess of the limits which City Loan felt it should tolerate*. Some of these misrepresented values had been certified to by C. J. Lonsway either on form 294 or upon the note and mortgage itself."

Thirdly, whether such misrepresentations of values were within or beyond the range practiced in the industry and regardless of what practices may or may not, under certain circumstances, be "tolerated" in retail merchandising, the law cannot depend upon or shape itself to the morals of the market place. There can be no compromise within the definition of "honesty."

In any event, the above "practice" does not and could not explain away the knowledge that C. J. Lonsway had lied as, to the accounts being genuine and justifiable good accounts, that he had permitted the use of City Loan funds to support and continue a check float, and that he had falsely certified having inspected and verified the existence of non-existent extra equipment.

(10) In Mortgage Corp. of New Jersey v. Aetna Casualty & Surety Co., 19 N.J. 30, 115 A.2d 43 (1955) the court construed a fidelity bond and found an employee dishonest as a matter of law under facts identical with those presented here. There, plaintiff company was in the construction loan business. It provided funds to builders on a progress payment basis. An employee was responsible for inspecting the progress of construction and for certifying that a certain stage had been reached as a condition precedent to the disbursement of plaintiff's funds. The certifications were on forms furnished by plaintiff and each of those forms required the employee's signature. For a period of time, however, the employee signed and submitted the requisite periodic certifications that a certain level of construction had been accomplished without having made the required inspection. He relied instead upon information supplied by the borrower's construction superintendent. He accepted such information at its face value and disbursed funds as requested by the borrower. He claimed that severe storms and physical disabilities had made it virtually impossible for him to make the required personal inspections. He testified he neither profited from the dishonest disbursements nor intended to cause harm. In determining that the employee's certification of inspections—where in fact no such inspections had been made—was dishonest, the court held the described conduct demonstrated:

"* * * significant lack of probity, integrity or trustworthiness * * 'or a breach of trust'. * * * Under the admitted facts he palpably was faithless to his trust and deceived his employer; it matters not that his conscious deceptions may not have been accompanied by intent to cause actual monetary loss to his employer and may have been induced by motives of personal comfort or convenience rather than personal profit or gain for, in any event, his conduct was morally as well as legally wrongful" (115 A.2d 46, 48).

Where, as in the instant case, one has actual knowledge of facts which without more, constitute dishonesty as a matter of law, it follows that one has actual knowledge of dishonesty as a matter of law.

(11) It is true that the machinations betwen C. J. Lonsway and Jack Herman were much greater and broader in scope than the acts of dishonesty actually discovered by the officers of City Loan, and that the full facts were not discovered until sometime during the spring

of 1958. However, that is not the test. The knowledge or discovery of dishonesty does not depend upon knowledge or discovery of the full scope and exact details of the entire affair. American Surety Co. of New York v. Bankers Savings & Loan Assoc., 59 F.2d 577, 579 (8th Cir., 1932). Brown v. Maryland Casualty Co., 111 Vt. 30, 11 A.2d 222, 223, 129 A.L.R. 1404 (1940); Gilmour v. Standard Surety & Casualty Co., 292 Mass. 205, 197 N.E. 673, 676 (1935); Public Warehouses of Matanzas v. Fidelity & Deposit Co., 77 F.2d 831, 832 (2d Cir., 1935); Morrellville Deposit Bank v. Royal Indemnity Co., 294 Pa. 446, 144 A. 424, 425 (1928). Nor does the discovery of dishonesty depend upon an absolute determination that a claim is in fact to be made under the bond even where, as it is not true of the bond in suit, the discovery of an actual loss due to dishonesty is required. American Surety Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898); American Surety Co. of New York v. Bankers Savings & Loan Assoc., 59 F.2d 577, 580 (8th Cir., 1932).

(12) Knowledge or discovery of dishonesty does not depend upon knowledge of the total misconduct when viewed in retrospect and with the obvious advantages of hindsight, but rather upon knowledge of facts which, in the light of proven circumstances surrounding those facts and in the light of reasonable inferences which can be drawn from those facts, would inform the ordinary, reasonable and sensible employer that dishonesty has occurred which might involve the surety in liability. National Life Ins. Co. v. Olhaber et al., 9 Ohio Dec.Reprint 842 (1899); American Surety Co. of New York v. Bankers Savings & Loan Assoc., 59 F.2d 577, 579 (8th Cir., 1932); Brown v. Maryland Casualty Co., 111 Vt. 30, 11 A.2d 222, 223 (1940); Gilmour v. Standard Surety & Casualty Co., 292 Mass. 205, 197 N.E. 673, 676 (1935); Public Warehouses of Matanzas v. Fidelity & Deposit Co., 77 F.2d 831, 832 (2d Cir., 1935); Morrellville Deposit Bank v. Royal Indemnity Co., 294 Pa. 446, 144 A. 424, 425 (1928);

Gamble-Robinson Co. v. Massachusetts Bonding & Ins. Co., 113 Minn. 38, 129 N.W. 131 (1910).

(13) Knowledge arises when the employer knows, or has reasonable cause or opportunity to know, that there has been dishonesty, and such knowledge is actual knowledge within the meaning of the rule. 72 C.J.S. Principal and Surety § 150b, p. 638; 50 Am.Jur., Suretyship, § 348, p. 1135. Knowledge of dishonesty can arise either by knowledge derived from known facts or from reasonable inferences of fact. Gilmour v. Standard Surety & Casualty Co., 292 Mass. 205, 197 N.E. 673, 676 (1935). The discovery of dishonesty does not depend upon a confession or the ability to brand a specific employee as a thief. Gamble-Robinson Co. v. Massachusetts Bonding & Ins. Co., 113 Minn. 38, 129 N.W. 131 (1910). While the foregoing rule is a proper rule and one against which the knowledge of Messrs. Meredith and Teehan could have been measured, and while this Court does not believe the officers acted in deliberate bad faith, it is clear that their knowledge was greater than that required under the above rule. This Court is satisfied and has therefore concluded that the officers had actual knowledge of specific acts which in and of themselves, without the need of inferences or aid from surrounding circumstances, constituted dishonest acts, concerning which plaintiff was required under the bonds in suit, but failed, to give notice to the surety.

(14) Finally, defendant is not estopped to raise the defense of the knowledge of dishonesty by reason of defendant's retention of the portion of the bond premium applicable to the period from May 15, 1957 to October 1, 1958 when it cancelled the bond in suit. There was no evidence that defendant was aware of the existence of this defense when it cancelled the bond in suit on October 1, 1958, more than three months in advance of the submission by City Loan of any sort of a definitive description or summary of either the types or the extent of its claimed losses. There

was no evidence of any reliance by City Loan on such action to its detriment. Defendant raises this defense only as to coverage for C. J. Lonsway and other employees of the Painesville branch office and not as to any other fidelity claims or losses which were discovered during the period between May 15, 1957 or October 1, 1958 at any of plaintiff's 150 branches. 20 O.Jur.2d, Estoppel and Waiver, §§ 35, 36, 42, 55, 57, 68, 69.

(15) In the light of the above conclusions which dispose of this case, the Court deems it unncessary to reach further conclusions as to the other defenses raised. Nonetheless, in view of the great attention given to such defenses by the parties some additional observations appear to be in order:

(a) Though this Court need not and therefore does not decide whether plaintiff's representation that there would be frequent audits of cash and accounts by City Loan's own staff at all branch offices, would preclude recovery under the bonds, it is clear that there were no audits of cash and accounts at the Painesville branch between 1955 and 1958 under any accepted definition of the word "audit".

(b) Though the Court need not and therefore does not decide whether plaintiff complied with the notice provision of the bond after Gill's disclosure of the facts at the home office on May 23, 1958, the Court feels that the officers did not act with any deliberate bad faith before giving notice thereafter by letter dated June 9, 1958.

(c) Though the Court need not and therefore does not decide whether there was any net loss to City Loan as a result of the dishonesty involved, it appears to the Court that the several Credits submitted by the defendant were accurately computed, have considerable merit, were not speculative or conjectural and were of a type permissible to be set off against the claim involved, including those credits involved in the issue of bond coverage for interest and finance charges received by City Loan on manipulated accounts during the period of the admitted dishonest manipulation of such accounts.

(d) This case involved a claim based on 277 accounts dating between the years 1953 and 1958 and additional complex manipulations dating from 1950. Trial lasted 17 days, involved 220 exhibits and 24 witnesses (among whom were accountants and experts) and resulted in a transcript of 2236 pages. The defenses to the claim and the credits sought to be applied against the claim likewise involved a multitude of events and transactions and references to several thousand accounts dating from 1950, together with substantial and complex legal questions. These factual and legal defenses were interposed in good faith and were supported by much evidence. Under such circumstances, no true evaluation of plaintiff's claim could be made without the benefit of a judicial determination of the complex legal, factual and accounting issues involved. Accordingly the Court, in the exercise of its discretion, does not feel it could have granted plaintiff 6% interest prior to the date of judgment had plaintiff been entitled to judgment in any amount.

Accordingly, an Order will be entered granting judgment for the defendant.